# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
May 28, 2008 Session, Heard at Cookeville[1]

## STATE OF TENNESSEE v. MARCO M. NORTHERN

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2004-A-664      Steve Dozier, Judge**

---

**No. M2005-02336-SC-R11-CD - Filed August 26, 2008**

---

We granted this appeal to consider whether the courts below correctly held that <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), does not bar the introduction into evidence of the defendant's <u>Mirandized</u>[2] videotaped confession which occurred after the defendant made an incriminating admission during a prior unwarned custodial interrogation. This Court has not previously interpreted and applied <u>Seibert</u>. After carefully considering the plurality opinion, the concurring opinions, and the dissenting opinions in <u>Seibert</u>, we conclude that the courts below correctly held that <u>Seibert</u> does not bar admission of the defendant's videotaped confession. We further hold that this Court's decision in <u>State v. Smith</u>, 834 S.W.2d 915 (Tenn. 1992), interpreting the right against self-incrimination provided by article I, section 9 of the Tennessee Constitution, does not bar admission of the defendant's videotaped confession. Accordingly, we affirm the judgment of the Court of Criminal Appeals, which affirmed the defendant's conviction of second degree murder but remanded for resentencing.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Affirmed**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which CORNELIA A. CLARK, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined. JANICE M. HOLDER, J., concurring and dissenting.

Ross E. Alderman, District Public Defender; Jeffrey A. DeVasher, Assistant District Public Defender (on appeal); and Jason Gichner and Amy D. Harwell, Assistant District Public Defenders (at trial), for appellant, Marco M. Northern.

---

[1]Oral arguments were presented at Derryberry Hall on the campus of Tennessee Technological University in Cookeville, Putnam County, Tennessee, as a part of the **S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents (S.C.A.L.E.S.) project.

[2]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Elizabeth T. Ryan, Senior Counsel; Sophia S. Lee, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachel Sobrero and Amy Eisenbeck, Assistant District Attorneys General, for appellee, State of Tennessee.

## OPINION

### I.  Factual Background

On October 27, 2003, at approximately 10:30 p.m., Metropolitan Nashville police officers were dispatched to an automobile accident with injuries at the corner of Sixteenth Avenue and Wheelus Street in Nashville, a neighborhood notorious for  drug deals and prostitution.  Upon arriving at the scene, the police discovered that a red Dodge Ram truck had collided with a fire hydrant and a utility pole, causing the pole to collapse.  The unconscious white male driver of the truck appeared to be dead, but the police were unable to aid him or to remove him from the vehicle because live electrical power lines were  draped over the truck.  The officers requested assistance from Nashville Electric Service ("NES") and the fire department.

After NES personnel arrived and turned off the electrical power, police and fire department personnel removed the driver, later identified as James Combs, from the vehicle and placed him in an ambulance.  Emergency medical technicians were unable to revive Combs, but they discovered a gunshot wound on his left side and notified the police.  Learning of the gunshot wound, the officers declared the accident scene to be a homicide crime scene and requested assistance from the homicide division.

At approximately 11:30 p.m., homicide detective Charles Robinson arrived, inspected the scene, made notes, and canvassed the neighborhood for witnesses.  Detective Robinson and other officers went house-to-house inquiring whether anyone had heard or seen what had happened.  Using flashlights and vehicle headlights for illumination, Detective Robinson and the officers searched the scene for shell casings for several hours.  The officers did not find witnesses, shell casings, or any other evidence to assist them in solving the crime.

Over the next two days, Detective Robinson and three other detectives returned to the scene and again canvassed the area.  As a result of these efforts, the detectives determined that the shooting actually occurred near Cockrill and Sixteenth Avenue.  While they were unable to develop a formal suspect list, detectives were able to compile a list of persons who were seen in the vicinity of the shooting.  Detectives returned to the area on each of the next several days, interviewing residents and other persons who had been seen in the vicinity of the shooting.  On November 5, during one of these interviews, the detectives saw the defendant walking along the opposite side of the street.  The defendant was listed among the persons seen in the vicinity of the shooting, so the detectives called out to him, intending to conduct an interview.  However, the defendant ran from the area and eluded the detectives.

About the same time the next day, November 6, the detectives returned to the area. Seeing the defendant in a nearby yard, they again called out to him, and again, he ran away, but an area resident blocked his escape route, enabling the detectives to overtake him. Detective Robinson asked whether the defendant knew why the detectives wanted to speak with him, and the defendant replied, "about that white man in the red truck." When asked why he had fled, the defendant replied that he had drugs in his possession. Upon searching the defendant, the detectives found marijuana and crack cocaine. They arrested the defendant for drug possession and transported him to the Criminal Justice Center. At this time, however, the detectives did not administer the warnings prescribed by Miranda v. Arizona, 384 U.S. 436 (1966).

After they arrived at the Criminal Justice Center, Detective Robinson seated the defendant at a table in the center of the "Murder Squad Office" while he and the other detectives completed paperwork on the defendant's drug-related arrest at desks surrounding the table. As they worked, the detectives discussed the shooting among themselves. In general, the conversation minimized the shooter's responsibility and implied that the victim assumed the risk of being murdered when he drove late at night into a neighborhood notorious for crime. After listening to the detectives' conversation for about twenty minutes, the defendant announced that he had been present at the shooting. Detective Robinson then stopped his paperwork and re-located the defendant to an interview room, advising the defendant as they walked to be truthful because the defendant likely would be administered a polygraph after the interview.

As they entered the interview room, Detective Robinson turned on a videotape recorder. After Detective Robinson administered the Miranda warnings and reviewed a rights-waiver form, the defendant signed the waiver. Detective Robinson then began questioning the defendant, using open-ended questions and speaking in a conversational and non-adversarial tone. The questioning remained polite and courteous throughout the interview. Neither the defendant nor Detective Robinson ever raised his voice, became upset or excited, or left his seat. The defendant was not restrained in any way during the interview, nor did he attempt to leave the interview room. The defendant did not request an attorney or ask to speak to family members. Detective Robinson alone conducted the interrogation, and no other detective or law enforcement official came into the room during the interrogation.

Detective Robinson asked the defendant to tell him what happened, and the defendant readily confessed to shooting the victim, explaining that the shooting occurred because the victim tried to drive away with the defendant's crack cocaine without paying for it. According to the defendant, he had been riding his bicycle along the street when the victim's vehicle stopped in front of him. After directing the defendant to the driver's side window, the victim asked for "dope." The defendant handed the victim a rock of crack cocaine about the size of a pencil eraser. When the victim complained that the quantity of cocaine was not worth the defendant's asking price, the defendant told the victim to either return the drug or pay for it. According to the defendant, the victim behaved strangely and leaned away from the window, causing the defendant to point his gun at the victim and again demand the return of the drug. The defendant then heard the engine "rev up." As the victim drove away with the drug, the doorframe of the truck struck the defendant's arm, and

he shot the victim. The defendant implied that the shooting was an unintentional result of the doorframe striking his arm. However, at other times during the interrogation the defendant admitted he intentionally shot the victim to prevent the victim from stealing the drug. When Detective Robinson asked about the murder weapon, the defendant said he had thrown it into the Cumberland River. The police never recovered the weapon.

The defendant was indicted for first degree premeditated murder. Prior to trial, he filed a motion to suppress his videotaped confession, arguing that the detectives had previously interrogated him without providing Miranda warnings. Specifically, the defendant argued that the detectives' conversation about the shooting as he sat within earshot at the table in the Murder Squad Office constituted the functional equivalent of express questioning for purposes of Miranda. While the defendant admitted Detective Robinson provided him Miranda warnings at the beginning of the subsequent videotaped interrogation, the defendant maintained that the prior unwarned interrogation tainted his videotaped confession, making it inadmissible as "fruit of the poisonous tree" and as a continuation of the prior unwarned interrogation. The defendant also argued that he had been using drugs and alcohol on the day of his arrest and was too intoxicated to understand his rights when he signed the waiver.

At the hearing on the motion to suppress, Detective Robinson and the defendant testified. The videotape of the postwarning interrogation also was introduced in evidence. The trial court described the defendant's testimony that he had been so intoxicated he could not understand his rights when he signed the waiver as inconsistent with his testimony accurately recollecting the events of the evening of his arrest. After "review[ing] the videotape," the trial court opined that the defendant "was fully aware of the rights he was waiving and appeared to provide coherent responses to the detective's questioning." The trial court also pointed out that the "defendant['s] . . . previous felony arrests" made him "familiar with the process." In determining whether the defendant's argument that his initial unwarned interrogation rendered his postwarning interrogation inadmissible, the trial court framed the threshold question as "whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as Miranda requires." The trial court pointed out that no proof had been presented to indicate that the detectives routinely withhold Miranda warnings and interrogate a suspect until a confession is gained. The trial court also concluded that no evidence indicated that the officers' earlier discussions about the shooting coerced the defendant or prevented him from understanding his Miranda rights and voluntarily speaking with Detective Robinson during the postwarning videotaped interrogation. Accordingly, the trial court denied the motion to suppress.

The case proceeded to trial. The State's primary evidence against the defendant was the videotaped confession. While the police searched the victim's truck and the scene of the shooting, they recovered neither the crack cocaine nor any other physical evidence implicating the defendant in the shooting. However, the State offered the testimony of Michael Martin, an acquaintance and former neighbor of the defendant who was incarcerated at the time of trial. Martin recalled that he and the defendant drank whiskey together at Martin's home during the day and the early evening of October 27, when the murder occurred. According to Martin, the defendant left on his bicycle while

it was still daylight. Martin recalled the defendant saying as he rode away: "I ain't got no money, I'm flat going to rob somebody." Martin continued drinking after the defendant left, and he did not take seriously the defendant's comment. According to Martin, about thirty minutes to one hour after the defendant left, he heard two gunshots and a crash. Martin walked to the site of the crash, saw the victim's Red Dodge truck, but did not see the defendant or his bicycle in the area.

According to the medical examiner, the autopsy revealed the victim died from lethal blood loss caused by a penetrating gunshot wound to the left side of his body. Therapeutic levels of Valium as well as metabolites of cocaine were found in the victim's blood, meaning the victim had used cocaine several hours before his death but was not under its influence at the time of the shooting. While the medical examiner recovered two bullets, there was only one entry wound. According to a ballistics expert, these "tandem" bullets were caused by the gun having been previously fired but the bullet not discharging from it. When the victim was shot, a second bullet discharged, struck the undischarged bullet, and propelled it along the same path as the second bullet. These bullets traveled the same path until they entered the victim's body, where one bullet lodged near the victim's armpit and, after striking his aorta and pulmonary artery, another bullet lodged in the victim's chest wall. The bullets traveled a relatively straight, left to right, slightly downward path. Gunpowder stippling found around the bullet hole in the victim's shirt showed the firearm had been located six inches or less from the victim's body when it was fired.

Based on the foregoing proof, the jury convicted the defendant of the lesser included offense of second degree murder. The trial court sentenced the defendant to twenty-four years as a Range I standard offender with no early release eligibility.

The defendant appealed, raising five issues. The Court of Criminal Appeals affirmed the defendant's conviction of second degree murder but remanded for a new sentencing hearing. The defendant thereafter filed an application for permission to appeal raising a single issue: Did the Court of Criminal Appeals correctly hold that Missouri v. Seibert, 542 U.S. 600 (2004), does not bar admission of the defendant's post-Miranda statement despite a finding that his pre-Miranda statement was the product of custodial interrogation? We affirm the judgment of the Court of Criminal Appeals.

## II. Standard of Appellate Review

On appeal from the denial of a motion to suppress, we review the trial court's legal conclusions de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). In conducting this analysis, we defer to the trial judge's findings of fact unless the evidence preponderates against those findings. See State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted

to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23; accord Walton, 41 S.W.3d at 81.[3] The party prevailing in the trial court is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998); see also State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000); Odom, 928 S.W.2d at 23.

### III. Admissibility of Defendant's Confession

On appeal, the defendant presses his claim that the detectives, through the functional equivalent of express questioning, interrogated him without providing Miranda warnings until they obtained an incriminating admission, and that this prewarning admission led to his subsequent Mirandized videotaped confession. The defendant argues that Seibert mandates suppression of his videotaped confession in these circumstances. The State responds that the detectives' conversation among themselves did not amount to interrogation as it did not constitute the functional equivalent of express questioning. The State points out that Detective Robinson provided Miranda warnings before initiating the videotaped custodial interrogation, and that the defendant executed a written waiver of his Miranda rights. The State maintains, therefore, that Seibert is irrelevant because this case does not involve an unwarned custodial interrogation followed by a Mirandized custodial interrogation. The defendant's claim requires us to revisit several decisions of the United States Supreme Court and interpret and to apply as a matter of first impression the 2004 decision in Missouri v. Seibert.

### A. Custodial Interrogation

Historically, courts of the United States evaluated the admissibility of confessions under a voluntariness test that originated in the common law courts of England and which recognized that coerced confessions are inherently untrustworthy. See Dickerson v. United States, 530 U.S. 428, 432-33 (2000) (discussing the history and development of the voluntariness test). Two constitutional bases were cited for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment. Id. at 433. However, "for the middle third of the 20th century" decisions of the United States Supreme Court "based the rule against admitting coerced confessions primarily, if not exclusively, on notions of due process." Id. While the Court has never abandoned its due process jurisprudence, the Court's landmark Miranda decision shifted the focus for determining the admissibility of confessions from the Due Process Clause of the Fourteenth Amendment to the Self-Incrimination Clause of the Fifth Amendment. Id. at 434. The Self-Incrimination Clause guarantees that "[n]o person . . . shall be

---

[3]De novo review applies when a trial court's findings of fact are based solely on videotaped evidence that appellate courts are as capable as trial courts of reviewing and assessing the credibility. State v. Payne, 149 S.W.3d 20, 25 (Tenn. 2004); State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). De novo review does not apply in this appeal, however, because the trial court's findings of fact were based on both live testimony and a videotaped confession.

compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.[4]

In Miranda, the Court opined that the coercion inherent in modern custodial police interrogation blurs the line between voluntary and involuntary statements and heightens the risk that an individual will not be "accorded his privilege under the Fifth Amendment . . . not to be compelled to incriminate himself." 384 U.S. at 439. In order to lessen the risk of such an inherently coercive atmosphere, the Court declared that "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." Id. at 467. To avoid the difficult post hoc judicial inquiry into the circumstances of police interrogations common to the voluntariness test, the Court articulated "concrete constitutional guidelines for law enforcement agencies and courts to follow." Id. at 442; see also Dickerson, 530 U.S. at 444. Specifically, the Miranda Court held

> the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

Miranda, 384 U.S. at 444. Now familiar, Miranda's procedural safeguards require the police to warn a person, prior to any custodial interrogation,

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.

Id. at 478. The warnings and waiver mandated by Miranda "are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant" during custodial interrogation, whether inculpatory or exculpatory. Id. at 444, 476-77. When Miranda warnings are given and a waiver obtained, the prosecution has "a virtual ticket of admissibility" for any resulting custodial statement of the defendant. Seibert, 542 U.S. at 608-09. Indeed, "maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina" and usually is a losing argument in court. Id. at 609; see also Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984) ("[C]ases in which a defendant can make a colorable

---

[4]The federal constitutional privilege against self incrimination applies to the states though the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 8 (1964) ("The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement–the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence.").

argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.").

As the Miranda Court emphasized, however, these warnings are not required in the absence of custodial interrogation. Miranda, 384 U.S. at 478 ("The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated."); Walton, 41 S.W.3d at 82 (explaining that the Miranda warnings are only applicable to custodial interrogations). In determining whether a person is in custody for purposes of Miranda, a court must examine the circumstances surrounding the interrogation and inquire "whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (internal quotations and citations omitted); see also Payne, 149 S.W.3d at 32; State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996).

Custody is not a disputed issue in this appeal. The defendant had been arrested on the drug-related charges before his arrival at the Criminal Justice Center. Thus, the defendant was in custody for purposes of Miranda at the time he initially admitted being present at the scene of the shooting and later when he provided the videotaped statement.[5] There also is no dispute in this appeal that Detective Robinson's questioning of the defendant during the videotaped interview constituted interrogation. However, the parties do not agree on whether the detectives' previous conversation about the shooting within earshot of the defendant amounted to interrogation.

"Interrogation" for purposes of Miranda includes "express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). The functional equivalent of express questioning refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301 (footnotes omitted).

> The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

---

[5]When Detective Robinson initially encountered the defendant he asked whether the defendant knew why the detectives wanted to talk with him, and the defendant responded, "[A]bout that white man in the red truck." Another detective asked the defendant why he had run from the detectives, and the defendant responded because he had drugs on his person. The admissibility of these statements is not at issue in this appeal; thus, we need not decide whether the defendant was in custody when the detectives posed these questions.

Id. at 301-02 (footnotes omitted).

Police arrested the defendant in Innis on suspicion of armed robbery of a cab driver; however, the defendant did not have a weapon in his possession at the time of his arrest. Id. at 294. On three separate occasions after his arrest, the police provided Innis Miranda warnings. Id. On the third occasion, Innis told the officer he understood his rights, and he asked to speak with an attorney. Id. Thereafter, a police captain instructed three patrol officers to transport Innis to the police station and to not question, intimidate, or coerce Innis. Id. En route to the police station in a police car that had a wire mesh screen between the front and rear seats, two of the officers conversed about the missing gun. Id. One officer expressed concern about the possibility that one of the children from a nearby school for handicapped children might find Innis's missing weapon and be injured. Id. When an officer remarked that "it would be too bad" if a little girl "pick[ed] up the gun and maybe kill[ed] herself," Innis interrupted the officers' conversation and revealed the location of the gun. Id. at 294-95. Innis argued that the officers' conversation amounted to interrogation.

The United States Supreme Court disagreed with Innis, noting that the "record in no way suggest[ed] that the officers' remarks were designed to elicit a response." Id. at 302. Furthermore, no evidence suggested "that the officers were aware that the [suspect] was peculiarly susceptible to an appeal to his conscience concerning the safety of handicapped children." Id. at 302. The fact that the "officers' comments struck a responsive chord" did not, without more establish that the suspect was subjected to the "functional equivalent" of express questioning for purposes of Miranda. Id. at 303. Thus, Innis recognizes that express questioning is not necessary to trigger Miranda warnings, and that a conversation among officers within earshot of a suspect may constitute interrogation for purposes of Miranda when the suspect is in custody and the police are aware that their words or actions are reasonably likely to evoke an incriminating response. Id.

In order to determine whether, under Innis, the detectives' conversation amounted to interrogation, we turn to the proof offered at the suppression hearing. Detective Robinson testified in detail about the circumstances occurring between the time of the defendant's arrest and the defendant's Mirandized videotaped confession. Detective Robinson transported the defendant to the Murder Squad Office at the Criminal Justice Center, but he denied questioning or conversing with the defendant en route. When they arrived, Detective Robinson seated the defendant at a table in the center of the office while the officers worked at desks nearby, completing the paperwork associated with the defendant's drug-related arrest. Detective Robinson recounted,

> [W]e were going to have to [prepare an] arrest report, incident report and do, type up affidavits for the drug charges on the computer. And while we were doing that we were talking, myself, Detective Baltimore and Detective Cecil, basically trying to downplay the incident. . . . We were talking to each other, but [the defendant] could hear us.

Detective Robinson admitted the defendant made several comments in response to the detectives' conversation, explaining:

Well, you know, he would make statements. Well, I wasn't even out there that night. He would say stuff, but we just continued on with our statements. And at one point he did admit that he was out there on the night of the shooting. . . . At that point in time, we stopped doing what we were doing and decided I wanted to go ahead and take him across the hall to do a formal interview with him. Before we got ready to go over there I asked him a question. I said Marco, I said, have you ever had a polygraph examination before? He said, no. I said, well that's a lie detector test. I said, now, it is important that you be truthful with us because, and I said, after you give this, enter this statement to me at some point in time I may ask you to take a polygraph examination, so I'm going to know if you're being truthful or not. So it's important for you to tell the truth. At that time we went over to the room, sat down, [and] I read him his <u>Miranda</u> rights.

Detective Robinson estimated that the defendant remained at the table listening to the detectives converse for approximately twenty minutes before announcing that he had been present on the night of the shooting.

On cross-examination, Detective Robinson clarified his earlier testimony, stating that, by describing the conversation among the officers as "trying to downplay" the incident, he meant the officers were "making comments that, you know, he, the [victim] shouldn't have been over there to the neighborhood" and "[t]rying to make it seem like [the shooting] wasn't that big of a deal." Detective Robinson added, "And that's not my true feeling, but <u>I was basically saying it because, like I said, I wanted him to talk to me.</u>" (Emphasis added.) The detective also admitted that he was attempting to elicit a response when he mentioned the possibility of administering the defendant a polygraph. On redirect examination, Detective Robinson said that he had not been attempting to elicit a response from the defendant by downplaying the shooting, but that he had been instead "trying to prime [the defendant] for [his] future interview" and that his "intent was to put in [the defendant's] mind that, hey, this wasn't no big deal, I can tell them about it."

The defendant also testified at the suppression hearing, claiming that, earlier on the day of his arrest, he had smoked marijuana heavily and ingested cocaine. The defendant claimed Detective Robinson questioned him during the drive to the Criminal Justice Center, asking the defendant about his whereabouts on the evening of the shooting and advising the defendant that the officers could "place [him] on 16th that night." According to the defendant, when they arrived at the Criminal Justice Center, Detective Robinson sat facing him at the table, questioning the defendant while a second detective sat at a nearby table and a third detective stood behind the defendant. After the defendant denied "basically everything they asked [him]," including being in the area of the shooting, Detective Robinson asked if the defendant "want[ed] to take a polygraph." When the defendant declined, Detective Robinson responded, "[W]ell, you don't have to take one because I know you [are] lying to us[,] and I know you know something about this." Frightened because he "didn't think there was no way [he] could get around that polygraph test," the defendant told the detectives what happened. Later the detectives asked him about "Mario's" involvement in the shooting, and the defendant "stopped talking" because he knew "they tricked [him]." Detective

Robinson then escorted the defendant to the interview room, placed a paper on the table itemizing the defendant's rights, briefly left the room, returned to the room, and instructed the defendant to sign the paper. After the defendant signed the paper, Detective Robinson asked the defendant to tell him "what happened again." On cross-examination, the defendant argued with prosecution counsel about whether the illegal drugs he claimed to have used on the day of the shooting were active in his system when he gave the videotaped statement.

Upon carefully considering the record and the relevant authorities, we agree with the Court of Criminal Appeals that the detectives' conversation during the twenty minutes the defendant remained seated in the Murder Squad Office amounted to the functional equivalent of express questioning. We base our conclusion upon both Miranda and Innis. In each of these decisions, the United States Supreme Court recognized that, in a custodial setting, certain psychological ploys, such as casting blame on the victim or society, minimizing the culpability of the offender, or minimizing the moral seriousness of a crime are "techniques of persuasion, no less than express questioning" which "amount to interrogation." Innis, 446 U.S. at 299; see also Miranda, 384 U.S. at 450 (describing psychological interrogation tactics police officers use "to minimize the moral seriousness of the offense, [or] to cast blame on the victim or on society.").

Here, Detective Robinson acknowledged minimizing the seriousness of the crime and blaming the victim for being in the neighborhood because he wanted the defendant to talk to him. The Court in Innis opined that, where a police practice is designed to elicit an incriminating response from the accused, the practice likely will be one that the police should have known was "reasonably likely to have that effect." Innis, 446 U.S. at 301 n.7. In our view, the detectives' conversation amounted to interrogation because the detectives should have known that the conversation was reasonably likely to elicit an incriminating response from the defendant. Thus, the detectives should have provided the defendant Miranda warnings before initiating this conversation. The State did not attempt to introduce into evidence the defendant's unwarned admission that he was present at the scene of the shooting. However, because we have concluded that the officers interrogated the defendant by the functional equivalent of express questioning before administering Miranda warnings, we must now determine whether Seibert requires suppression of the defendant's subsequent Mirandized videotaped confession.

### B. Federal Constitution

To answer this question, we turn to several decisions of the United States Supreme Court, beginning with Westover v. United States, a case consolidated with Miranda. Carl Calvin Westover had been arrested by Kansas law enforcement officials in connection with two Kansas City robberies. Miranda, 384 U.S. at 494. Westover was also charged with two federal felonies stemming from the robbery of a savings and loan association and a bank in Sacramento, California. Id. Beginning on the night of his arrest and continuing until shortly before noon the next day, Kansas officials questioned Westover on several occasions, for a total of more than fourteen hours of interrogation. Id. at 494, 496. At no time did the Kansas officials provide Westover any warnings as to his rights. Id. at 495.

At noon on the day after his arrest, just after Kansas officials concluded their interrogations, three special agents of the Federal Bureau of Investigation ("FBI") interrogated Westover concerning the federal charges. Id. At the beginning of their interrogation, the FBI agents advised Westover that he did not have to make a statement, that any statement he made could be used against him, and that he had the right to see an attorney. After two to two and one-half hours of interrogation, Westover signed separate confessions, admitting guilt as to each California robbery. Id. These statements included a written acknowledgment of the prior rights advisement. Id.

Westover's statements were introduced at his federal trial, he was convicted of the offenses, and the circuit court affirmed his convictions. Id. However, in Miranda, the United States Supreme Court reversed Westover's convictions, holding that his confessions had been compelled and should not have been introduced as evidence against him. Id. The Court provided the following explanation of why the warnings provided by the FBI agents were insufficient to safeguard Westover's Fifth Amendment rights:

> On the facts of this case we cannot find that Westover knowingly and intelligently waived his right to remain silent and his right to consult with counsel prior to the time he made the statement. At the time the FBI agents began questioning Westover, he had been in custody for over 14 hours and had been interrogated at length during that period. The FBI interrogation began immediately upon the conclusion of the interrogation by Kansas City police and was conducted in local police headquarters. Although the two law enforcement authorities are legally distinct and the crimes for which they interrogated Westover were different, the impact on him was that of a continuous period of questioning. There is no evidence of any warning given prior to the FBI interrogation nor is there any evidence of an articulated waiver of rights after the FBI commenced its interrogation. The record simply shows that the defendant did in fact confess a short time after being turned over to the FBI following interrogation by local police. Despite the fact that the FBI agents gave warnings at the outset of their interview, from Westover's point of view the warnings came at the end of the interrogation process. In these circumstances an intelligent waiver of constitutional rights cannot be assumed.

Id. at 495-96.

Nineteen years later, in Oregon v. Elstad, 470 U.S. 298 (1985), the Court considered "whether the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper Miranda warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." Elstad, 470 U.S. at 303. In Elstad, the police arrested the eighteen-year-old defendant at his home on a burglary charge. Id. at 300. One of the officers went into the kitchen with Elstad's mother to explain why the officers were making the arrest. Another officer remained in the living room and asked Elstad if he knew why the officers were there. Id. When Elstad responded that he did not, the officer asked whether Elstad knew a person named Gross. Elstad admitted knowing Gross and commented that

-12-

he had heard about a robbery at Gross's home. Id. at 301. When the officer expressed his belief that Elstad had been involved in the robbery, Elstad replied, "Yes, I was there." Id. The officers then transported Elstad to police headquarters, where he was provided Miranda warnings. Id. About an hour later, Elstad waived his rights and provided the police a full confession. Id. at 301-02. Prior to trial, Elstad moved to suppress his confession, arguing that the unwarned response at his home to what amounted to custodial interrogation "let the cat out of the bag," rendering the subsequent confession a "fruit of the poisonous tree." Id. at 302.

The Elstad Court rejected these arguments, explaining that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Id. at 318. The Court distinguished Westover, emphasizing that Westover's confession had been "actually coerced," despite the warnings provided by the FBI agents. Id. at 310. Under such circumstances, courts determining the admissibility of a subsequent statement must consider the totality of the circumstances, including the passage of time between the initial unwarned and the subsequent warned interrogations, the location of the unwarned and warned interrogations, and the identity of the interrogators. Id. Writing for the Court in Elstad, Justice O'Connor declared that it would be an

> unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

Id. at 309. "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" as to the second statement. Id. at 314. Where the initial unwarned statement was voluntary, the admissibility of the second statement depends only on whether it, too, was voluntary, and obtained in compliance with Miranda. Id. at 318. Thus, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Id. at 318.

In rejecting Elstad's argument that his subsequent postwarning statement should have been suppressed as fruit of the poisonous tree, the Court refused to attribute constitutional significance to the "psychological effects" of a voluntary unwarned admission, reiterating that "[t]he failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." Id. at 310. The Court also emphasized that the fruits doctrine originated in the context of the Fourth Amendment exclusionary rule, where the objective is to deter unreasonable searches, no matter how probative their fruits. Id. at 306. By contrast, the Fifth Amendment objective is to bar the introduction of compelled statements from the prosecution's case-in-chief. Id. at 307. Because Elstad's prewarning statement was voluntary, the Court refused to

suppress his postwarning voluntary confession. The Elstad Court explained its holding as follows:

> The Court today in no way retreats from the bright-line rule of Miranda. We do not imply that good faith excuses a failure to administer Miranda warnings; nor do we condone inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him. A handful of courts have, however, applied our precedents relating to confessions obtained under coercive circumstances to situations involving wholly voluntary admissions, requiring a passage of time or break in events before a second, fully warned statement can be deemed voluntary. Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of Miranda and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.

Id. at 317-18.

It must be remembered, however, that Elstad dealt only with "a simple failure to administer the [Miranda] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will[.]" Id. at 309. Nineteen years later, in Seibert, the Court faced a situation not presented in Elstad: the failure of the police to administer Miranda warnings in "circumstances calculated to undermine the suspect's ability to exercise his free will." Elstad, 470 U.S. at 309. After Elstad, law enforcement agencies developed a two-step, "question-first" interrogation tactic whereby officers would intentionally refrain from giving Miranda warnings to suspects in custody until after they had elicited an unwarned confession which they knew to be inadmissible. The police would then administer Miranda warnings and conduct a second interrogation, framing the questions for this second interrogation with information gained in the prior unwarned interrogation. Suspects would confess in the second interrogation, largely repeating the information provided in the first interrogation. While defendants often challenged the admissibility of these second confessions, courts relying on Elstad frequently rejected such challenges. Seibert, 542 U.S. at 609-11; United States v. Ollie, 442 F.3d 1135, 1141 (8th Cir. 2006).

-14-

The confession at issue in Seibert was obtained by use of the question-first interrogation strategy. Patrice Seibert's twelve-year-old son had cerebral palsy and died in his sleep. Fearing she would be charged with neglect because of bedsores on his body, Seibert, two of her teenage sons, and two of their friends conceived a plan to conceal the facts surrounding her son's death. They agreed to burn the family's mobile home with the child's dead body inside. To avoid the appearance that the child had been left unattended, they also agreed to leave Donald Rector, a mentally ill teenager who had been living with the family, inside the home. One of Seibert's teenage sons and a friend set the blaze. Rector died in the fire. Seibert, 524 U.S. at 604.

Five days later, at 3:00 a.m., the police arrested Seibert at the hospital where her son was receiving treatment for the burns he sustained setting the fire. The arresting officer had been instructed to refrain from administering Seibert Miranda warnings. Seibert, 524 U.S. at 604. The officer transported Seibert to the police station, and left her alone in an interview room for fifteen to twenty minutes. Id. Another officer then questioned Seibert for thirty to forty minutes without providing Miranda warnings, at times "squeezing her arm and repeating 'Donald was also to die in his sleep.'" Id. at 605. Eventually, Seibert admitted that she had planned for Rector to die in the fire, and the interrogating officer then allowed her a twenty-minute coffee and cigarette break. Id. After the break, the same police officer turned on a tape recorder, gave Seibert Miranda warnings, and obtained her signed waiver of rights. Id. The officer then resumed the interrogation, stating "Ok, 'trice,[6] we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" Id. Using leading questions based on information gained in the prewarning interview, the interrogating officer elicited a full confession from Seibert. Id.

Seibert was thereafter charged with first degree murder, and she moved to suppress both her pre- and post-Miranda statements. Id. At the suppression hearing, the interrogating officer testified that he made a "conscious decision" to withhold Miranda warnings. Id. at 605. The trial court suppressed Seibert's prewarning statement, but admitted her postwarning confession. Id. at 606. Applying Elstad, the Missouri intermediate appellate court affirmed. Id. The Supreme Court of Missouri reversed, distinguishing Elstad on the ground that warnings had not been intentionally withheld in that case. Id.

The United States Supreme Court affirmed the judgment of the Missouri Supreme Court. Id. at 607. However, the Court was sharply divided in Seibert, producing four separate opinions: a plurality opinion, authored by Justice Souter and joined by Justices Stevens, Ginsburg, and Breyer; a concurring opinion by Justice Kennedy; a concurring opinion by Justice Breyer; and a dissenting opinion authored by Justice O'Connor and joined by Chief Justice Rehnquist and Justices Scalia and Thomas.

Our analysis begins with the Seibert plurality which declared that "[t]he object of question-first is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." Seibert, 542 U.S. at 611. Thus, according

---

[6]This is apparently an abbreviated version of "Patrice."

to the plurality, when police question first and warn later, the threshold inquiry is

> whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as Miranda requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with Miranda, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

Id. at 611-12. The plurality expressed doubt about the effectiveness of the warnings in such circumstances, observing "it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." Id. at 613.

It must be noted, however, that the Seibert plurality followed Elstad to the extent that it rejected application of the Fourth Amendment "fruits" doctrine to the testimonial fruits of a Miranda violation. Id. at 612 n.4. The plurality also described Missouri's argument that Elstad authorized the introduction of confessions obtained by the question-first interrogation strategy as "disfigur[ing] the case." Id. at 614. Rather, the plurality "read Elstad as treating the living room conversation as a good-faith Miranda mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally." Id. at 615. The plurality described the facts in Seibert as presenting "the opposite extreme . . . which by any objective measure reveal a police strategy adapted to undermine the Miranda warnings." Id. (footnotes omitted). The plurality emphasized that the interrogating officer in Seibert made a "conscious decision" to use the question-first "interrogation technique he had been taught." Id. at 605-06. Nonetheless, the plurality refused to base its analysis on the subjective intent of the officer, noting that "the intent of the officer will rarely be as candidly admitted as it was here." Id. at 616 n.6. Focusing "on facts apart from intent that show the question-first tactic at work, " id., the plurality stated:

> The contrast between Elstad and this case reveals a series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

Id. at 615.  The plurality concluded that the relevant facts indicated that the delayed Miranda warnings in Seibert were not effective.  Id. at 616-17.

In his separate concurring opinion, Justice Breyer expressed a preference for "a simple rule" that would "apply to the two-stage interrogation technique" and which would require courts to "exclude the 'fruits' of the initial unwarned questioning unless the failure to warn was in good faith." Seibert, 542 U.S. at 617 (Breyer, J., concurring).  Nonetheless, Justice Breyer joined the plurality decision in full, predicting that

> the plurality's approach in practice will function as a "fruits" test.  The truly "effective" Miranda warnings on which the plurality insists, . . . will occur only when certain circumstances—a lapse in time, a change in location or interrogating officer, or a shift in the focus of the questioning—intervene between the unwarned questioning and any postwarning statement.

Id. at 618 (Breyer, J., concurring).

Justice Kennedy's separate concurring opinion provided the fifth vote necessary for the judgment of the Court in Seibert.  However, Justice Kennedy disagreed with the plurality's analysis, explaining:

> [The plurality's] test envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations.  In my view, this test cuts too broadly.  Miranda's clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity.

Id. at 621-22 (Kennedy, J., concurring) (internal citations omitted).  Justice Kennedy reiterated his view that "[t]he admissibility of postwarning statements should continue to be governed by the principles of Elstad unless the deliberate two-step strategy was employed."  Id. at 622.  Justice Kennedy's proposed analysis would apply "only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning."  Under such circumstances, Justice Kennedy would exclude "postwarning statements that are related to the substance of prewarning statements . . . unless curative measures are taken before the postwarning statement is made."  Id.  Justice Kennedy emphasized that "[c]urative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver."  Id.  "[A] substantial break in time and circumstances between the prewarning statement and the Miranda warning" is one example of a curative measure that may be sufficient "as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn."  Id.  Providing the suspect with an additional warning explaining the likely inadmissibility of the unwarned statement is another option that, in Justice Kennedy's opinion, also "may be sufficient" as a curative measure.  Id.  Because no curative

steps were taken in Seibert, Justice Kennedy agreed with the plurality's decision to reverse the defendant's conviction. Id.

Justice O'Connor dissented in Seibert, joined by Chief Justice Rehnquist and Justices Scalia and Thomas. The dissenting justices would have analyzed "the two-step interrogation procedure under the voluntariness standards central to the Fifth Amendment and reiterated in Elstad." Seibert, 542 U.S. at 628 (O'Connor, J., dissenting). As previously explained, under Elstad, "[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." Elstad, 470 U.S. at 314. However, the dissenting justices agreed with the plurality on two key points. First, the dissenting justices agreed that the "plurality appropriately follow[ed] Elstad in concluding that Seibert's statement cannot be held inadmissible under a 'fruit of the poisonous tree' theory." Id. at 623 (O'Connor, J., dissenting). The dissenting justices also expressly endorsed "[t]he plurality's rejection of an intent-based test," explaining that "[f]reedom from compulsion lies at the heart of the Fifth Amendment, and requires us to assess whether a suspect's decision to speak truly was voluntary. Because voluntariness is a matter of the suspect's state of mind, we focus our analysis on the way in which suspects experience interrogation." Id. at 624.

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" Marks v. United States, 430 U.S. 188, 193 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)); see also Coe v. State, 17 S.W.3d 193, 209 (Tenn. 2000). Tallying the votes from the various Seibert opinions provides only minimal clarity as to the analysis governing the issue in this case. Justice Kennedy's concurring opinion is generally viewed as more narrow than the plurality opinion.[7] However, Justice Kennedy's focus on the interrogating officer's intent is directly inconsistent with the reasoning of the other plurality justices and with the reasoning of the dissenting justices. In light of the seven votes explicitly rejecting Justice Kennedy's intent-based test, disagreement exists concerning the analysis that Seibert instructs courts to apply when determining the admissibility of postwarning statements. See, e.g., Edwards v. United States, 923 A.2d 840, 848 (D.C. 2007) (observing that "there is some disagreement concerning the precise analysis that Seibert mandates"); United States v. Carrizales-Toledo, 454 F.3d 1142, 1151 (10th Cir. 2006) ("Determining the proper application of the Marks rule to Seibert is not easy, because arguably Justice Kennedy's proposed holding in his concurrence was rejected by a majority of the Court."); United States v. Stewart, 388 F.3d 1079, 1090 (7th Cir. 2004) (reading the plurality's balancing test into Justice Kennedy's requirement of "curative steps"); see also Daniel S. Nooter, Is Missouri v. Seibert Practicable?: Supreme Court Dances the "Two-Step" Around Miranda, 42 Am. Crim. L. Rev. 1093, 1094 (Summer 2005). In this appeal we need not attempt to foretell which, if any, of the

_____

[7]See Edwards v. United States, 923 A.2d 840, 848 n.9 (D.C. 2007) (citing cases holding that because Justice Kennedy's concurring opinion in Seibert is more narrow than the plurality opinion, his opinion is of special significance).

Seibert approaches will eventually garner the agreement of a majority of the justices of the United States Supreme Court. We conclude, as did the Court of Criminal Appeals, that the defendant's videotaped confession was properly admitted under any of the competing tests.

Five of the justices deciding Seibert—the dissenting justices[8] and Justice Kennedy—agreed that where there is no showing that the police deliberately employed the two-stage, question-first interrogation strategy, Elstad continues to supply the relevant analysis for courts determining the admissibility of postwarning statements. Seibert, 524 U.S. at 622 (Kennedy, J., concurring); Seibert, 524 U.S. at 628 (O'Connor, J., dissenting). As the trial court and the Court of Criminal Appeals explained, there simply is no evidence showing, or even suggesting, that Detective Robinson deliberately employed the question-first interrogation tactic aimed at circumventing Miranda, such as that used by the interrogating officer in Seibert. In the absence of evidence that the interrogating officer deliberated employed such a strategy, a majority of the Seibert court—Justice Kennedy and the four dissenting justices—would apply Elstad to determine the admissibility of the defendant's postwarning statement. Under Elstad, "[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." Elstad, 470 U.S. at 314. The record on appeal is entirely devoid of evidence suggesting that the defendant's prewarning statement was involuntary or coerced. Despite the defendant's argument, our conclusion that the detectives' conversation about the shooting amounted to interrogation does not itself mean that the defendant's prewarning statement was coerced. Rather, the record indicates that the defendant's response was voluntary, albeit unwarned.

Additionally, nothing in the record suggests that the Miranda warnings provided at the beginning of the videotaped interrogation were ineffective or that the videotaped confession was otherwise coerced or involuntary. Only after Detective Robinson provided Miranda warnings and obtained a rights waiver did he begin expressly questioning the defendant. Although the defendant maintained that he had been previously questioned by Detective Robinson and the other detectives, Detective Robinson denied previously questioning the defendant, and the trial court accredited Detective Robinson's testimony. The evidence in the record does not preponderate against the trial court's finding.

Unlike the interrogating officer in Seibert, Detective Robinson did not confront the defendant with information obtained in the previous unwarned custodial interrogation. Rather, during the short, nineteen-minute videotaped interrogation,[9] Detective Robinson asked open-ended questions or asked the defendant to clarify information he had previously provided during the videotaped

---

[8]Two of the dissenting justices in Seibert are no longer serving on the United States Supreme Court. Chief Justice William H. Rehnquist died on September 3, 2005. Justice Sandra Day O'Connor announced her retirement on July 1, 2005.

[9]The record shows that the videotaped interview began at 5:01 p.m. and ended at 5:20 p.m. Included in this nineteen minute interrogation was the Miranda rights advisement and waiver.

interrogation. Detective Robinson's tone was conversational and his demeanor unthreatening. The defendant confessed readily, with no prodding from Detective Robinson.

At the suppression hearing, the defendant disputed Detective Robinson's testimony concerning his arrest and confession; however, the trial court accredited Detective Robinson's testimony. Again, the evidence in the record does not preponderate against the trial court's finding. Thus, applying Elstad, as five justices of the Seibert Court would do, we conclude that the trial court did not err in admitting the defendant's postwarning videotaped confession because there is no evidence in the record showing that either the prewarning admission or postwarning confession was involuntary.

We obtain the same result when we apply the analysis adopted by the Seibert plurality. In determining the admissibility of a postwarning confession, the plurality asks whether the Miranda warnings given at the second interrogation meaningfully and sufficiently apprised a reasonable suspect in the defendant's position of his right to remain silent. Seibert, 524 U.S. at 612. In measuring "effectiveness," the plurality focuses upon the following factors:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogation], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first [round of questioning.]

Id. at 615.

Application of this analysis immediately reveals many distinctions between this case and Seibert which indicate that the warnings given in this case were effective. Unlike Seibert, where the officers deliberately withheld Miranda warnings prior to explicitly questioning the defendant for thirty to forty minutes while repeatedly suggesting the answer to the most incriminating inquiry, none of the detectives in this case ever explicitly questioned the defendant before providing Miranda warnings. Rather, for some or all of the twenty minutes he remained seated at the table in the Murder Squad Office, the detectives engaged in conversations among themselves. While this Court has concluded that the actions of the detectives were the functional equivalent of express questioning for purposes of Innis and Miranda, the conversations did not elicit a detailed confession or, indeed, any incriminating statements other than the defendant's spontaneous remark that he had been at the scene of the crime. We therefore conclude that, because the detectives did not engage in a prewarning course of explicit questioning that sought or elicited the complete and detailed statement sought and elicited in the postwarning statement, the first factor of the plurality's test indicates that the Miranda warnings provided at the beginning of the videotaped interrogation were effective.

The second factor of the plurality test, which examines the degree to which the defendant's prewarning and postwarning statements overlap, also indicates the warnings were effective. Seibert, 542 U.S. at 615. During the prewarning interrogation in this case, the defendant merely admitted

being present at the scene on the night of the shooting. Through their investigation the detectives had already discovered that the defendant was present in the vicinity of the shooting. Their knowledge of this fact led the detectives to call out to the defendant in the first place. While the detectives no doubt welcomed the defendant's prewarning admission, it bears little resemblance to the complete prewarning confession provided by the defendant in Seibert. By contrast, in Seibert, the prewarning phase of the interrogation left "little, if anything, of incriminating potential . . . unsaid." Id. at 616. Here, the defendant did not provide a detailed incriminating statement until after Detective Robinson advised him of his Miranda rights, and the defendant waived these Miranda rights. Accordingly, the second factor of the plurality's test also supports a conclusion that the Miranda warnings were effective in this case.

We agree with the Court of Criminal Appeals that, in this case, the third factor of the plurality's test—the timing and setting of the two rounds of questioning—provides only minimal guidance on whether the warnings were effective. While the videotaped interrogation occurred only a short time after the detectives' conversation elicited a response, there was a brief and clear break when Detective Robinson relocated the defendant from the Murder Squad Office to an interview room. This fact weighs in favor of a conclusion that the warnings provided at the beginning of the second interrogation were effective.

The fourth and fifth factors of the plurality's analysis—the continuity of police personnel and the degree to which the interrogator's questions treated the second round as continuous with the first round of questioning—also provide little support for the defendant's position that the statement should have been suppressed. While Detective Robinson was involved in both interrogations, there is little risk that the defendant perceived the videotaped interrogation as a continuation of an earlier interrogation. We cannot emphasize enough, that unlike Seibert, the defendant in this case had not previously provided a detailed confession in response to specific, targeted questions. He merely admitted to being present on the night of the shooting in response to provocative conversation he overheard. Thus, providing the defendant Miranda warnings at the beginning of the videotaped interrogation did not pose the "oddity of warning about legal rights . . . after the police had led [the suspect] through a systematic interrogation." Seibert, 542 U.S. at 615-17. Because Detective Robinson had not led the defendant through an initial round of systematic express questioning, the videotaped interrogation was not treated as a continuation of the prewarning interrogation.

Therefore, applying the plurality's multi-factor analysis, we agree with the Court of Criminal Appeals and the trial court that the Miranda warnings Detective Robinson provided the defendant at the beginning of the videotaped interview were effective to safeguard the defendant's Fifth Amendment right against self-incrimination and to ensure that his waiver of those rights was voluntary and knowing. Accordingly, we reject the defendant's argument and hold that Seibert does not bar the admission of the defendant's postwarning videotaped interrogation.

### C. Tennessee Constitution

As the Court of Criminal Appeals recognized, the defendant's right against self-incrimination

is also protected by article I, section 9 of the Tennessee Constitution, which provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Although "we have traditionally interpreted article I, [section] 9 to be no broader than the Fifth Amendment," State v. Martin, 950 S.W.2d 20, 23 (Tenn.1997), one "significant difference between these two provisions is that the test of voluntariness for confessions under Article I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992) (citing State v. Smith, 834 S.W.2d 915 (Tenn.1992)); see also Walton, 41 S.W.3d at 81-82.

Not only did this Court, in State v. Smith, 834 S.W.2d 915 (Tenn. 1992), interpret article I, section 9 more broadly than the Self-Incrimination Clause of the Fifth Amendment, we specifically disagreed with Elstad and held that

> extraction of an illegal, unwarned confession from a defendant raises a *rebuttable* presumption that a subsequent confession, even if preceded by proper Miranda warnings, is tainted by the initial illegality. That presumption may be overcome by the prosecution, however, if the State can establish "that the taint is so attenuated as to justify admission of the subsequent confession."

Id. at 919 (quoting Elstad, 470 U.S. at 328 (Brennan, J., dissenting)). We framed the central inquiry as "whether the events and circumstances surrounding and following the initial, illegal conduct of the law enforcement officers prevented the accused from subsequently (1) making a free and informed choice to waive the State constitutional right not to provide evidence against one's self, and (2) voluntarily confessing . . . involvement in the crime." Id. We identified several factors that courts must consider when answering these questions, including:

> 1. The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged, subsequent confession;
>
> 2. The temporal proximity of the prior and subsequent confessions;
>
> 3. The reading and explanation of Miranda rights to the defendant before the subsequent confession;
>
> 4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;
>
> 5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning

occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;

6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;

7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;

8. Whether the defendant initiated the conversation that led to the subsequent confession; and

9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered Miranda rights.

Id. 919-20. We cautioned that no single factor is determinative; instead, "a court must examine the totality of the circumstances surrounding the two confessions to determine whether the subsequent confession by the defendant can truly be termed a knowing and voluntary statement." Id. at 920.

The defendant relied upon Article I, section 9 of the Tennessee Constitution in the motion to suppress he filed in the trial court; however, the defendant has not on appeal relied upon either article I, section 9 or Smith. While the defendant appears to have abandoned the state constitutional basis of his claim, we will address this issue because the videotaped confession was crucial to the prosecution's case against the defendant. If its admission violated Smith, then the defendant would be entitled to relief via plain error review.[10]

Under plain error review, this Court will grant relief only where five prerequisites are met: (1) the record clearly establishes what occurred in the trial

---

[10]As the dissent points out, Tennessee Rule of Appellate Procedure 13(b) provides that appellate review generally will extend only to those issues presented by the parties. However, the dissent overlooks the fact that the three grounds listed in Rule 13(b) as justifying consideration of issues not presented for review are non-exhaustive. See Tenn. R. App. P. 13(b)("The appellate court . . . may in its discretion consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process."). Extending review in this case is justified, "among other reasons" in order that we may consider an issue of state constitutional law involving the crucial evidence the State relied upon to convict the defendant of second degree murder. This justification appears to be at least as weighty as those enumerated in Rule 13(b). Certainly nothing in Rule 13(b) prohibits this Court from reviewing an issue of state constitutional law which the defendant raised in the trial court and which the Court of Criminal Appeals reviewed for plain error. However, it should be noted that rather than refusing to restrict the scope of our review, as the dissenting justice believes, we are applying a type of review–plain error–which is by definition limited in scope and applicable only where, as here, an issue has not been preserved for appeal.

court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing United States v. Olano, 507 U.S. 725, 734 (1993)).

State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007). Because admission of the defendant's videotaped confession did not violate article I, section 9 of the Tennessee Constitution as interpreted in Smith, the defendant is not entitled to relief via plain error review.

The facts Smith identified as relevant in 1992 are similar to the multifactor analysis adopted by the Seibert plurality in 2004. Having just applied the Seibert plurality's analysis to the facts of this case, we need not reinvent the wheel. We shall briefly review how consideration of the Smith factors supports our conclusion that the defendant's postwarning statement was voluntary and not tainted by the prewarning admission. The defendant was not mistreated, isolated, or deprived of nourishment, water, or bathroom facilities during his brief detention between arrest and videotaped interrogation. No one prevented the defendant from contacting friends, family, or legal counsel. Far from prolonged, the videotaped interrogation continued for only nineteen minutes, including the rights advisement, acknowledgment, and waiver. The defendant was detained at the Criminal Justice Center only twenty minutes before the videotaped interrogation commenced. No evidence suggests that the videotaped interrogation was designed to wear down the defendant's resistance or overcome his free will. Rather, Detective Robinson and the defendant treated each other with respect during the videotaped interrogation. Although brief, there was a short break between the detectives' conversation in the Murder Squad Office that elicited the defendant's admission and the subsequent videotaped interrogation when Detective Robinson relocated the defendant from the table in the Murder Squad Office to the interview room. Moreover, the evidence does not preponderate against the trial court's findings that the defendant was fully aware of the rights he was waiving, that the defendant responded coherently to the detective's questioning, and that the defendant's previous arrests and convictions gave him a familiarity with the process that aided his understanding of his rights. The defendant received appropriate Miranda warnings at the beginning of the videotaped interrogation. The defendant verbally acknowledged understanding the rights advisement, and he executed both a written acknowledgment and waiver of his rights. While the defendant argues that illegal drugs he used earlier in the day of his arrest impaired his ability to understand and to waive his rights, the trial court rejected this argument. The evidence does not preponderate against the trial court's finding on this issue.

Certainly, as the Court of Criminal Appeals recognized, some of the Smith factors support the defendant's position. As noted, very little time elapsed between the defendant's admission of being present at the shooting and his videotaped confession. Also, Detective Robinson maintained control of the defendant in the interrogation environment from the time of his arrest throughout the

videotaped confession. Finally, no evidence indicates that Detective Robinson advised the defendant that his prewarning admission likely would not be admissible at trial. We emphasize, however, that the factors identified in Smith were not intended to serve as a balance sheet. In accordance with Smith, we conclude that the events and circumstances surrounding and following the initial, illegal conduct of the detectives in this case did not prevent the defendant from either making a free and informed choice to waive his state constitutional right against self incrimination or from voluntarily confessing involvement in the crime. Id. at 919. Because admission of the defendant's videotaped confession did not violate his state constitutional right against self incrimination, the defendant is not entitled to relief via plain error review.

## IV. CONCLUSION

As explained herein we conclude that the trial court properly denied the defendant's motion to suppress. We conclude that neither Seibert nor Smith bar admission of the defendant's videotaped confession. Accordingly, we affirm the judgment of the Court of Criminal Appeals upholding the defendant's conviction of second degree murder. Because "[d]efense counsel's oral statement that the defendant elected to be sentenced under the new [2005] sentencing scheme was an ineffectual attempt to waive the defendant's ex post facto protections" the Court of Criminal Appeals remanded to the trial court "for resentencing under the old law or for a properly executed waiver of ex post facto protections." The State of Tennessee has not challenged this portion of the judgment of the Court of Criminal Appeals. Thus, this case is remanded "for resentencing under the old law or for a properly executed waiver of ex post facto protections."

Costs of appeal are taxed to the State of Tennessee for which execution may issue if necessary.

_____
WILLIAM M. BARKER, CHIEF JUSTICE

-25-