IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
August 25, 2009 Session

**STATE OF TENNESSEE v. JOHN TYLER BEASON**

**Appeal from the Criminal Court for Union County**
**No. 3492      E. Shayne Sexton, Judge**

---

**No. E2008-02831-CCA-R3-CD - Filed April 15, 2010**

---

The Defendant, John Tyler Beason, was convicted of attempted first degree murder, for which he received a twenty-year sentence as a Range I, standard offender. The Defendant appeals, contending that the trial court erred in denying his motion to suppress his pretrial statement and that the court erred in sentencing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Martha Yoakum, District Public Defender (on appeal); and A. Thomas Monceret, Knoxville, Tennessee (at trial), for the appellant, John Tyler Beason.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William Paul Phillips, District Attorney General; and Tracy Tipton Jenkins, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant was convicted in a jury trial for the May 18, 2002 shooting of Joshua Smith, committed when the Defendant was seventeen years old. Mr. Smith was mowing his lawn when he was struck in the head by a bullet. For years, no arrest was made. The Defendant was not charged with the crime until after he confessed in 2007. The Defendant testified at the trial that he shot the victim because his girlfriend, Jessica Keck, told him the victim raped her for several years when she was a young girl. He testified that on the date of the crime, the couple were driving past the victim's home, when Ms. Keck told him to kill the victim and handed him a rifle that he kept in his truck. He said he shot at the victim but did not think he hit him because the victim continued mowing. He acknowledged that he did

not tell the authorities in his 2007 statement that Ms. Keck told him to kill the victim and handed him the rifle but said he did not want to get her in trouble. He said he did not admit until 2007 that he was the perpetrator of the crime because he did not want to go to prison. Ms. Keck testified that she and the victim had been involved in "sexual explorations" that did not involve penetration when they were younger, but she denied having told the Defendant that the victim raped her or having told the Defendant to shoot the victim.

## I. SUPPRESSION

The Defendant's first issue is that the trial court erred in denying his motion to suppress his statement to the authorities. He argues that his waiver of his Miranda rights was not knowing, intelligent, and voluntary. The state responds that the trial court correctly rejected the Defendant's claim. We agree with the State.

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

"The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (citing State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994)); see State v. Northern, 262 S.W.3d 741 (Tenn. 2008). For a confession to be considered voluntary, it must not be the product of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). The essential question, therefore, is "'whether the behavior of the State's law enforcement officials was such as to overbear [the Defendant's] will to resist and bring about confessions not freely self-determined . . . .'" State v. Kelly, 603 S.W.2d 726, 728 (1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)). The Supreme Court has held that in order

for a confession to be involuntary, it must be the product of coercive state action.  See, e.g., Colorado v. Connelly, 479 U.S. 157, 163-64 (1986).

The evidence at the suppression hearing and the trial was materially the same with respect to this issue, although it was more detailed at the suppression hearing.  Our summary includes both proceedings.

Union County Sheriff's Detective Steve Rouse testified that he gave the Defendant a ride from the Defendant's home to the sheriff's department on March 2, 2007.  He said the Defendant had agreed earlier to talk to the authorities about some checks the Defendant had written without his sister's permission.  He said that the car in which he transported the Defendant was not a marked car and that the Defendant rode in the front seat.  He said he had the Defendant go into his office and never put the Defendant in a jail cell or behind a locked door.  He said he would have taken the Defendant home if the Defendant asked.

Detective Rouse testified that he and Detective Brandon Smith advised the Defendant of his Miranda rights and had him sign a written waiver.  He said the Defendant indicated his understanding and signed the form at 9:10 a.m.  He said the Defendant did not appear to be under the influence.  He said he was distantly related to the Defendant and was familiar with him.  He said the Defendant appeared as he normally did.  He denied that the Defendant seemed drowsy, unsteady on his feet, or had bloodshot eyes.  He said that for about twenty minutes, they discussed the forged checks and the Defendant's desire to go into the military.

Detective Rouse testified that he then told the Defendant that he had heard rumors that the Defendant was the person who shot the victim.  He said that the Defendant denied this twice and that he asked the Defendant to take a polygraph test.  He said the Defendant agreed but wanted Detective Rouse to administer the test.  He said that because he was not qualified to administer polygraph examinations, the Defendant agreed to take the test with Detective Rouse present.

Detective Rouse testified that the Defendant was taken upstairs to the "jury room" for the polygraph test.  He said that the Defendant was not handcuffed and that although he did not recall whether the Defendant took restroom breaks, this would have been permitted.  He identified the officers present for the test as himself, Detective Smith, and T.B.I. Agent Hannon.  He said Agent Hannon advised the Defendant of his rights verbally and in writing before the test.  He said Agent Hannon showed the Defendant that the door was unlocked and stated that the Defendant could leave if he wanted.  He said the Defendant signed a written consent for the test.

Detective Rouse testified that after the test, Agent Hannon told him outside the Defendant's presence that the test indicated that the Defendant had not been truthful. He said he then talked to the Defendant and told him they knew he shot the victim but they needed to know why. He said the Defendant said, "Well, it's because he had molested my girlfriend when she was younger." He said the Defendant asked how much jail time he would get, and he said he replied he did not know. He acknowledged that the Defendant hesitated before discussing the shooting, but he denied that the Defendant requested counsel or that he told the Defendant it would take all day to get an attorney.

Detective Rouse testified that the Defendant was allowed to take breaks to smoke and to eat lunch. He said he provided the cigarettes and food. He said that after they ate lunch, the Defendant agreed to give a written statement. He said he wrote the statement and the Defendant signed it. Detective Rouse testified that the Defendant was older than eighteen and had completed the twelfth grade.

Detective Rouse testified that the entire process from when he picked up the Defendant at home until the statement was completed took four hours and thirty-five minutes. He said the Defendant never asked to be taken home. He said he would have taken the Defendant home had the Defendant asked. He said he took the Defendant home after taking the statement and told the Defendant that there was more work to be done on the case. He said he did not make any assurances to the Defendant about the prosecution of the case, but he acknowledged that he told the Defendant several times that the Defendant would be going home at the end of the day. He said he did not arrest the Defendant until approximately March 8.

Detective Rouse testified that he heard the Defendant tell Agent Hannon that he was taking "withdrawal medication" and had taken it the night before the polygraph test. He said that when the Defendant was arrested, the Defendant's mother told him the Defendant was taking "withdrawal medication" and asked that he be allowed to take it.

Special Agent Mike Hannon testified that he administered the Defendant's polygraph test. He said he read the Defendant's Miranda rights to him and had him sign a document acknowledging them. He said the Defendant indicated he understood his rights. He said he went over the "polygraph medical assessment" with the Defendant. He said the Defendant admitted using marijuana the previous night. He said the Defendant admitted using cocaine, Oxycontin, methamphetamine, and Valium years earlier. He acknowledged that he had written "yrs" on the form next to these drugs but said this was for "years," not "yes." He also said the Defendant told him he had taken Subutex, a medication for withdrawals, the previous day. He said the Defendant did not appear to be under the influence.

Agent Hannon testified that the Defendant was not handcuffed or otherwise restrained. He said he told the Defendant he was free to leave at any time. He said he demonstrated to the Defendant that the door was unlocked. He said the Defendant had wires attached to his body that were used for the polygraph test and that he joked with the Defendant that if the Defendant decided to leave, the Defendant would need to give him time to remove the equipment because it was expensive.

Agent Hannon testified that after the test, he told Detective Rouse that he had ruled the results "deception indicated." He said that the Defendant was outside the room at this point but that he brought the Defendant back inside and told him he failed the test. He said that as they talked, the Defendant became emotional and said the victim had sexually abused the Defendant's girlfriend.

Agent Hannon testified that the Defendant was told he would be able to leave that day. He said the Defendant was told that Detective Rouse would notify him when he would need to return.

Agent Hannon denied that the Defendant asked to take his medication during the time he was questioning him. He also denied the Defendant requested counsel.

Detective Brandon Smith testified that he was involved in interviewing the Defendant on March 2 but was not present for the polygraph test. He said the door to the office where they talked to the Defendant was open and that the exterior door going to the hallway was closed but not locked. He said that to his knowledge, the exit in the hallway was not locked. He said the Defendant was never handcuffed on March 2. He said the Defendant did not appear to be under the influence of drugs or alcohol. He said he never heard Detective Rouse make promises to the Defendant about the prosecution of the case, although he acknowledged that he was present when Detective Rouse told the Defendant that after he finished his statement he would be taken home. He said that he knew the Defendant had been confined in the jail at least once before and that the Defendant knew his way around the courthouse.

Doctor Gregory Phelps testified as a defense witness at the suppression hearing. He said that he was a certified addictionologist and that the Defendant was his patient. He said that he had seen the Defendant sometime in February 2007, that he was treating the Defendant for various addictions, including an Oxycontin addiction, and that he was prescribing Subutex, "a powerful opiate agonist-antagonist" for the Defendant. He said the Defendant was taking Subutex three times a day.

Doctor Phelps testified that in his opinion, the Defendant would have been having "a substantial craving" by 1:30 p.m. on March 2 if he had not had Subutex since the afternoon or evening of March 1. He said that being under stress such as being questioned by officers and taking a polygraph test would increase the craving. He said that smoking marijuana would not affect the benefits of Subutex but that having used cocaine or Oxycontin earlier would make the cravings worse once the effect of the drug wore off. He said that in his opinion, it was more likely than not that a person who was undergoing such cravings would confess if he were told he would be allowed to go home afterwards.

Doctor Phelps testified that the symptoms of withdrawal included anxiety, stress, increased heart rate, dilated pupils, abdominal cramps, nausea, diarrhea, muscle jerking, and gooseflesh. He said that a person experiencing cravings would be inclined to request the medication. He said a lay person would be able to detect that a person was extremely anxious.

Doctor Phelps testified that he was supposed to have seen the Defendant by March 7, 2007. He said, however, the Defendant did not return after the February visit.

The Defendant testified that Detective Rouse picked him up on March 2. He said he was told Detective Rouse needed to see that the Defendant was paying for some checks. He said he did not know he was suspected of attempted murder until Detective Rouse asked him about it after they discussed the checks. He said that Detective Rouse asked him to take a polygraph test and that he said he refused fifteen or twenty times.

The Defendant testified that on the way upstairs, he asked for an attorney. He said Detective Rouse promised to take him home. He said he was never told anything about going to prison for fifteen to twenty-five years.

The Defendant testified that he was addicted to medication and drugs at the time. He said he was taking Subutex and had last taken it the evening of March 1. He said that he had also used cocaine and taken Oxycontin on the night of March 1 and that he might have taken Valium, as well. He said that Detective Rouse had asked him questions about drug abuse and "shooting up" on the way to the courthouse that day and that the detective knew he was addicted to drugs.

The Defendant testified that after he took the polygraph test but before he confessed, the officers made comments about not blaming him for shooting the victim because of the rape. He said they made comments that they probably would have done the same thing in his situation.

The Defendant testified that he was "stressed out" and scared. He said he just wanted to go home because he had "stuff waiting on me at the house." He said he was promised he could go home after he confessed. He said that was "part of" the reason he confessed. He said he was told it would take "all day if I waited on a lawyer" and that he "didn't have all day." He said he did not feel free to leave and did not know which doors were locked or unlocked. He said that he was not shown which doors were locked or unlocked and that he was never told he could leave at any time. He said he was told "plainly" that if he did not do certain things, matters would just be worse. He said that when he signed the statement confessing to the crime at 12:20 p.m., he would have signed anything in order to go home.

The Defendant acknowledged that he did not go back to Doctor Phelps between March 2 and his arrest. He said he had a military entrance drug test to take "on Monday."

In denying the Defendant's motion to suppress, the trial court stated:

> The State of Tennessee has presented a rights waiver, for lack of a better term, wherein the defendant has admitted initially each and every portion of the – with Exhibit 2 captioned Miranda; the defendant has admitted signing. There is also some information provided by the defendant on the back side of that document.
>
> As to the issue concerning custody, that is a case by case question, but I'm [going to] find in this particular case that there was a coercional [sic] environment on this setting. I'm not saying he's in custody. I'm saying that at some point, though, it became very clear this defendant was the subject of an investigation, in particular, after the polygraph came back showing deception and then the questioning began. In my mind, the officers took care of that by properly getting Miranda warning – a Miranda [form] signed. The – in my opinion, the officers have established – the State has established that the defendant made a voluntary, . . . knowing and intelligent waiver of his constitutional rights prior to the giving of information which, I suppose, answers the question concerning whether or not he was operating under some type of physiological distress resulting from his addiction or his drug use or his detoxification from the drug.

I find it funny that the defendant testified today he was starting – he was [going to] start the military – take a drug test the following Monday. This – March 2nd, if I'm not mistaken, was a Friday. He testifies in this Court that he was trying to clean up before a military drug test and then turns around and says that he had used all these illegal substances the night before. Questions of credibility in my mind go directly to the State, that that was a very incredible statement, and it hurt the defendant's credibility of what he said here today.

The . . . doctor's testimony was informative, but it was based on facts assumed and these facts were not conclusive. They are merely offerings by the Defense of what may have happened that day and what did not happen, or what could or could not have happened. And the doctor using his best medical judgment, did the guesswork that he could, but he firmly said he could not state the defendant was operating under some type of great distress over – over detox.

I find no . . . conclusive evidence that the will of the defendant was overborne prior to the taking of his statement, and I'm going to find his statement is admissible.

The record reflects that the Defendant was advised of his <u>Miranda</u> rights repeatedly, both verbally and in writing, and that the Defendant acknowledged and waived those rights. Although the Defendant was without his own transportation, he was told he was free to leave at any time. He was even shown that the door was unlocked before he was given the polygraph test that later led to his confession. The Defendant reported only Subutex and marijuana use recently, and he appeared alert and attentive with no signs of intoxication or impairment. The evidence to support the Defendant's claim consisted of his testimony, which the trial court discredited, and Doctor Phelps' testimony, which the trial court noted was based upon hypothetical facts, the existence of which the Defendant failed to establish. Considering all the evidence, we hold that the trial court did not err in determining that the Defendant's confession was voluntary, knowing, and intelligent.

## II. SENTENCING

The Defendant raises two challenges to the length of his twenty-year sentence. He argues that the trial court failed to impose a sentence consistent with the purpose and principles of the Sentencing Act and that the trial court sentenced him punitively because he

exercised his right to remain silent by not confessing to the crime for five years. The State responds that the sentence imposed was proper. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d) and -402(d) (2006).[1] As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

---

[1] The record reflects that the Defendant signed a written waiver which allowed him to be sentenced under 2005 Amendments to the 1989 Sentencing Act. See 2005 Tenn. Pub. Acts ch. 353, § 18 (effective June 7, 2005).

In imposing a specific sentence within the appropriate range of punishment for the defendant:

> [T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:
>
> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210.

At the sentencing hearing, the State offered certified copies of the Defendant's August 9, 2002 conviction for assault and his January 26, 2004 conviction for driving under the influence. The State also offered the presentence report and the victim impact statements as evidence.

The Defendant offered the testimony of John Fugate, one of the Defendant's former high school teachers. He testified that he had become friends with the Defendant and had gone hunting with him. He said he had never been concerned with the Defendant's use of firearms and had not seen the Defendant exhibit any aggressive tendencies at school.

Jill Beason, the Defendant' mother, testified that the Defendant attempted suicide twice after the crime. She said that on one of these occasions, he was arrested for assault after she found him trying to kill himself. She said that the Defendant had a knife, that she chased him and restrained him, and that he was able to free himself and get a gun. She said he was able to receive inpatient treatment for about a month as a result of this event. She said the Defendant did not actually assault her, despite his having the conviction. She said that Ms. Keck was able to influence the Defendant. She acknowledged that the Defendant had a long-standing drug problem.

Clark Ailor testified that he had been a lifelong friend of the Defendant. He said that the Defendant loved Ms. Keck and that she was capable of "winding him up." He said the Defendant was not an aggressive person.

The Defendant testified and asked the victim to forgive him. He said he had been misled and dominated by Ms. Keck. He also apologized to his family and friends. He said he had been in a psychiatric facility twice after the crime. He acknowledged that despite receiving treatment, he had continued to have a drug problem until he was jailed for this offense.

After receiving the evidence, the trial court found three enhancement factors, that the Defendant had a previous history of criminal convictions or criminal behavior, that the Defendant possessed or employed a firearm during the commission of the offense, and that before trial or sentencing the Defendant failed to comply with the conditions of a sentence involving release into the community. See T.C.A. § 40-35-114(1), (8), (9) (Supp. 2009). The trial court found that the Defendant was entitled to mitigation because he lacked substantial judgment in committing the offense due to this youth. See T.C.A. § 40-35-113(6) (2006). The court also made the following observations in imposing sentence:

> I find it at least a little bone chilling that this defendant lived, breathed, partied - was in this area from the time of the shooting until the detection of this crime and said nothing about it. There is something very, very cold and calculated about that entire situation. Of course the Defense has raised that there were other reasons. There was a girl that was somewhat responsible, that drugs were somewhat responsible.
>
> I suppose I'd have been a little more amenable to that type of response if the defendant at some point had stood up and said, this is what I did. You know, at some point, boys grow into men and they accept responsibility. Now, this is an extremely large level of responsibility to accept. However, to come in today and say, well, yeah, I did it, but I did it because some – and I know – and I will give Mr. Beason credit. He came in today and was as manly about it as I've heard him all the way through this, finally accepting responsibility. However, with that responsibility comes a consequence of committing an act that almost took the life of someone for no reason, for literal[ly] no reason. Whether or not someone told you to shoot doesn't matter. I mean we can get juvenile about it. I could talk

about jumping [off bridges]. I'm not [going to] do that. The – this is a bone chilling offense - the fact that someone is just literally in their yard minding their own business, doing what people do when they have a yard, and to be shot and not hear a word for a year.

I – you know, I see many, many victim impact statements over the years, and some are more compelling than others. This was, I mean – and the family, I'm sure you're entitled to the emotion that you have, no doubt about it. It's something that I can't always work into my sentencing. But, I can't imagine what that would be like at home not knowing who it was that took a shot at him. That just – that is – as we have sat here today, that's become very, very troubling.

Mr. Beason is a young man, still a young man. He was a young man when it happened. He – he has an opportunity at some point to grow up, but there will be consequences before then, and that consequence will be in a sentence and it will be a sentence of twenty (20) years. There is – that is mid range. That is not – doesn't mean anything legally, it just means where I felt like the enhancement factors outweighed the mitigating factors, and that that is a proper showing of the responsibility that goes along with an offense like this.

The Defendant's first contention about sentencing is that the trial court should not have applied the three enhancement factors to increase the sentence and that he should be sentenced as an especially mitigated offender. He argues that under the 2005 Sentencing Act, application of the enhancement factors is discretionary, and despite the facts supporting the application of the factors, the court should not have applied them based upon the circumstances of the case. The Defendant argues that there are facts favorable to him that should outweigh the evidence of the enhancement factors. What the Defendant seeks is essentially a new sentencing from this court without any deference accorded to the trial court's determination.

The record reflects, however, that the trial court considered the sentencing principles and all the relevant facts and circumstances in choosing to apply the enhancement and mitigating factors and in reaching its sentencing determination. The factors the court applied are adequately supported by evidence in the record. The court's decision is entitled to the

presumption of correctness. The Defendant has not shown that the trial court's actions in selection of enhancement factors and choosing the length of the sentence were improper.

The Defendant also contends that the trial court acted punitively in enhancing his sentence based upon the Defendant's exercise of his right to remain silent in the period of almost five years between the crime and the Defendant's confession. He focuses on statements made by the trial court at the sentencing hearing to support his argument. The record reflects that the trial court made comments that it found the crime "bone chilling" in part due to the victim's not knowing for a long time the identity of the person who tried to kill him. Upon consideration in context, however, it is apparent that the trial court's purpose was not to punish the Defendant for the exercise of a constitutional right, but to explain why the court was not compelled to show leniency based upon the Defendant's drug addiction, his manipulation by Ms. Keck, and other evidence proffered by the Defendant. The record contains victim impact statements, to which the trial court referred, that recount the extreme fear and anxiety the victim and his family suffered for years and the substantial lifestyle changes they made in order to cope with the crime and its lack of resolution. The facts and circumstances of the case were proper considerations for the trial court in imposing the sentence. See Ashby, 823 S.W.2d at 169. The trial court did not err.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE