# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 2, 2014

## STATE OF TENNESSEE v. MARTINEZ DENNIS

**Appeal from the Criminal Court for Shelby County**
**No. 12-02916     Lee V. Coffee, Judge**

---

**No. W2014-00403-CCA-R3-CD  - Filed February 20, 2015**

---

Appellant, Martinez Dennis, was convicted by a Shelby County jury of felony murder during the perpetration of a robbery and was sentenced by the trial court to life in prison.  In this appeal, he raises two issues: (1) whether the trial court erred in denying his motion to suppress his custodial statement to law enforcement officers; and (2) whether the evidence was sufficient to sustain his conviction.  Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Stephen C. Bush, District Public Defender; and Barry W. Kuhn (on appeal), Kindle Elizabeth Nance (at trial), and Gerald Daniel Skahan (at trial), Assistant District Public Defenders, Memphis, Tennessee, for the appellant, Martinez Dennis.

Herbert H. Slatery III, Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Amy P. Weirich, District Attorney General; and Douglas Gregory Gilbert and Lessie Lee Calhoun Rainey, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case involves the September 2011 robbery of a Bargain Mart store in Memphis and the first degree murder of the owner during perpetration of the robbery.

### I.  Facts

#### A. Suppression Hearing

Prior to trial, appellant filed a motion to suppress his custodial statement to law enforcement officers. At the hearing, appellant called Lieutenant Anthony Mullins with the Memphis Police Department as his first witness. Lieutenant Mullins testified that he first came in contact with appellant in relation to a robbery/homicide that occurred on September 13, 2011, at a "Bargain Mart" on South Parkway in Memphis. As part of his investigation, Lieutenant Mullins obtained video surveillance from the store's security system and a cellular telephone that had been dropped outside the front door of the store. He noted that another robbery had occurred at that location on September 3, 2011, and he obtained surveillance footage from that robbery, also. He stated that the two robberies were similar in that they involved two subjects, one of whom stood in the doorway and held the door open while the second one entered, pointed a weapon at the clerk, and demanded money. In both robberies, the subjects concealed their faces with a t-shirt worn over their heads from the nose down and tied in the back to secure it. Lieutenant Mullins said that the mannerisms of the gunmen, the words they spoke, and the voices on each videotape were "almost identical" for both robberies. In addition, in the first robbery, the gunman wore a black t-shirt with a white logo, and in the second robbery, that same shirt or one very similar to it was worn as a makeshift bandana.

Lieutenant Mullins contacted the service provider for the cellular telephone that he recovered at the scene, and it reported that the telephone belonged to "Martinze Denis." Lieutenant Mullins searched their database and found a "Martinez Dennis," which he believed to be "close enough" to warrant further inquiry. Upon investigation, Lieutenant Mullins learned that the address for appellant that was listed in his database matched the address provided by the cellular service provider. Based on this information, Lieutenant Mullins instructed investigators to attempt to locate appellant for questioning.

Lieutenant Mullins assembled a photograph array to use in connection with the September 3 robbery. In that instance, the gunman covered his head but not his entire face. In addition, witnesses observed the suspects standing outside of the store before the robbery occurred, and one witness was inside the store and further observed the suspects. Lieutenant Mullins was skeptical that the September 13 witnesses would be able to positively identify either suspect because their faces were better concealed that time. He and Sergeant Dan Switzer, who was investigating the September 3 robbery, ultimately showed the lineup to witnesses of both robberies.

Lieutenant Mullins stated that he interviewed Marcus Parker, an employee of the store. Mr. Parker was not present during the September 13 robbery/homicide but was present and observed the perpetrators during the September 3 robbery. Mr. Parker identified appellant from a photograph array. Lieutenant Mullins and Sergeant Switzer attempted to locate appellant for approximately one week, but when their search was unsuccessful, they

obtained a warrant for appellant's arrest for the September 3 robbery. Lieutenant Mullins stated that based on a comparison between the September 13 video and the booking photograph of appellant, he observed enough similarity to conclude that it was the same person. However, the similarity was not so conclusive that Lieutenant Mullins would have obtained a warrant "because it could be more [his] wanting it to be that person than being objective."

During the course of the investigation, Lieutenant Mullins learned that a fellow Memphis police officer was acquainted with appellant. Officer Tim Taylor's telephone number was listed in appellant's cellular telephone contacts. Lieutenant Mullins spoke with Officer Taylor and learned that he knew appellant but that he had not seen appellant for over a year. Officer Taylor watched the videos from both robberies and stated that the perpetrator "could be" appellant.

Lieutenant Mullins recalled that appellant was arrested on October 7 or 8. Lieutenant Mullins received a telephone call from his supervisor informing him that a retired police officer who worked at a local nightclub recognized appellant from a newscast and said that appellant would be arriving at the club to get paid for some work he had done there. Lieutenant Mullins arranged for an apprehension team to conduct surveillance on the club, and when the team notified him with a description of appellant and his clothing, Lieutenant Mullins arranged for other officers to perform a traffic stop and arrest appellant. When appellant was arrested, he was a passenger in a silver or gray Pontiac that matched the description of the one that had been used in the September 13 robbery/homicide. The driver, Carl Glenn, was also arrested. Lieutenant Mullins instructed officers not to search the car until a warrant was obtained but asked them to look through a window to see if a black t-shirt or red jacket was visible. An officer observed a red jacket that Lieutenant Mullins believed was worn in the September 3 robbery.

Lieutenant Mullins testified that appellant was arrested at 12:15 a.m. on October 8 on the warrant for the September 3 robbery and that he placed a forty-eight-hour hold on appellant so he could have an opportunity to interview appellant about the September 13 incident. Lieutenant Mullins thought that he had enough evidence to arrest appellant for the September 13 robbery and homicide, but he wanted to build a stronger case. Appellant and Glenn were taken to the police department offices between noon and 1:00 p.m. on October 8. Lieutenant Mullins and Sergeant Cox from the robbery division interviewed Glenn first, then they interviewed appellant beginning around 3:00 p.m. He first noted appellant's biographical information and asked appellant if he needed food, a drink, or a restroom break. He confirmed that appellant was not under the influence of an intoxicant and ascertained appellant's educational level, which was the eleventh grade in high school. Lieutenant

Mullins read appellant his rights, and appellant stated that he understood his rights and agreed to give a statement.

Initially, appellant denied any knowledge of the September 13 robbery and homicide. Lieutenant Mullins described that upon further questioning about his cellular telephone and learning that Lieutenant Mullins had recovered it outside the door of the store following the September 13 robbery, appellant became "a lot more nervous at that point." Appellant thereafter admitted his involvement in both robberies, which Lieutenant Mullins stated was "consistent with what was on the video." Lieutenant Mullins then directed appellant from the interview room to a desk where a transcriptionist typed appellant's formal statement as he gave it. Prior to appellant's giving a formal statement, Lieutenant Mullins again read appellant his rights. The transcribed interview began at 5:39 p.m. and ended at 6:16 p.m. Appellant signed the statement at 6:25 p.m. on October 8.

Lieutenant Mullins said that because he still had another interview to conduct with Glenn, he did not arrest appellant at that time. Lieutenant Mullins filed the affidavit of complaint charging appellant with first degree murder and robbery on October 9, 2011, at 9:33 p.m. and arrested him on October 10 at 7:56 a.m.

On cross-examination, Lieutenant Mullins clarified, "[Appellant] was arrested because he had the warrant, and I told them to add the charge of first degree murder with the forty-eight-hour hold on probable cause for the homicide. But the arrest was made because he had a warrant." However, he also acknowledged that the arrest ticket generated when appellant was arrested referenced a September 13 robbery in which an individual was shot and killed.

Appellant testified at the hearing on the motion to suppress. He recalled being arrested as he left a club and stated that before officers took him to the jail, they took him to "their station" to obtain his identifying information. He said that at that point, no one informed him why he was being arrested. Appellant alleged that officers did not speak with him on October 8 but rather waited until October 9 to interview him. He claimed that he did not execute the advice of rights form until after the formal interview had been completed. He said that if he had been advised of his rights prior to being interviewed, he would have asked for an attorney.

On cross-examination, appellant admitted that he was confused about the dates and times surrounding his arrest and his interview and that October 8 "may" have been the correct date.

The trial court concluded that in this case, officers had probable cause to arrest appellant for his involvement in the September 13 robbery/homicide and that any error with

regard to the forty-eight-hour hold did not result in a violation of appellant's constitutional rights. Accordingly, the trial court denied appellant's motion to suppress his statement.

B. Trial

At trial, the State's first witness was Ghassan Jaber. His brother-in-law previously had owned the Bargain Mart store and had recently transferred ownership to the victim, Elsawy Mohamed Kandel. Mr. Jaber was aware that the store had been robbed "seven to ten days before" the September 13 robbery and homicide of the victim. He conversed with the victim about keeping a gun behind the counter for protection, but the victim was opposed to using a weapon. He confirmed that the store had a video surveillance system installed.

After the robbery and homicide, a worker telephoned him and informed him that "something" had happened at the store and that he should go find out. When Mr. Jaber arrived, the police were on the scene and eventually informed him that the victim had been killed. Because the victim had no family in the area, Mr. Jaber was asked to identify his body.

Marcus Parker was the State's next witness, who testified that he previously worked at the Bargain Mart with the victim. He had worked there prior to the victim's taking possession of the store. Mr. Parker testified that the victim had recently purchased a home and was planning to bring his family to the United States within the month.

On the day of the robbery and homicide, Mr. Parker arrived at the store around noon. The victim asked him to go to the Wonder Bread store to purchase bread for the store. Mr. Parker arrived at the Bargain Mart after completing the errand in less than an hour's time. When he returned, he observed a police line. He informed an officer that he worked at the store, whereupon the officer removed him from his truck and placed him in a police cruiser. Mr. Parker remained on the scene for approximately two hours and gave a statement to the police. He provided officers with the code to "unlock" the video surveillance system. At some point, Mr. Parker viewed the video and saw that the victim attempted to protect his money by trying to grab the gun from appellant. Mr. Parker confirmed that the victim did not have a gun in the store because "nobody really want[ed] to cause [the victim] [any] harm."

David Williams, who was employed by Turner Dairy at the time of the trial, testified that he delivered dairy products to the Bargain Mart. On September 13, he arrived at the store and entered so that he could ascertain the products needed. He left the store and returned shortly with the necessary items. The victim "checked [him] in" and retreated to get Mr. Williams' money ready. As Mr. Williams began filling the cooler, he heard a

"commotion." He observed a gunman who said, "'Give me everything you got.'" Mr. Williams ducked and walked down an aisle, where he observed another customer at the meat counter. As soon as they were beside each other, the perpetrator fired the gun. Mr. Williams stated that this occurred around noon on September 13.

Mr. Williams observed the gunman's attire and stated that the gunman wore a hood or bandana around his face. He described the gunman as African-American and five feet, ten inches in height. He did not see the gunman enter but only became aware of his presence when he heard the "commotion." Mr. Williams saw the gun and stated that he believed it to be a black nine millimeter handgun. Mr. Williams remained at the rear of the store for around thirty seconds to a minute, then he "eased" up the aisle and looked around the corner. He saw the victim, unresponsive, lying face down in a pool of blood. He did not attempt to render aid but instead dialed 9-1-1. Mr. Williams recalled that the police arrived first, removed him and the other customer from the store, and placed them in different squad cars, where Mr. Williams remained for an hour to an hour and a half. Officers allowed Mr. Williams to complete his delivery route, and he returned to the police department later in the day to give a statement.

The State's next witness was Melvin Keith Burdette, a resident of the neighborhood where the Bargain Mart was located. Mr. Burdette was in the store around 11:00 a.m. to purchase some deli meat. When he arrived, the victim was assisting Mr. Williams, so Mr. Burdette waited his turn. Mr. Burdette saw the victim walk behind the counter, and two men entered the store. He heard "arguing or some confrontation" that became "extreme, intense," so he moved toward the back of the store. Mr. Burdette said that both men entered the store, and he described them both as having a slim build and a dark skin complexion. He also noticed a scarf or similar item around their faces from the mouth down. The confrontation escalated, and one of the perpetrators pulled out a gun. Mr. Williams met Mr. Burdette at the back of the store, at which time they heard a gun fire. Mr. Williams and Mr. Burdette remained in the store until officers arrived.

Mr. Burdette recalled that while they were waiting for the police, he and Mr. Williams peered around a corner and saw the victim lying face down. Mr. Williams surmised that he was not breathing and called 9-1-1. Mr. Burdette and Mr. Williams remained in their location until officers arrived. When officers arrived on the scene, the men were escorted to squad cars where they waited to be interviewed.

The State called Dr. Marco Ross, a forensic pathologist and deputy chief medical examiner for Shelby County, as its next witness. The trial court accepted Dr. Ross as an expert witness in the field of forensic pathology. Dr. Ross testified that he performed the autopsy of the victim, after which he determined the cause of death to be a gunshot wound

to the head and the manner of death to be homicide. Dr. Ross's findings noted an entry wound at the top of the victim's head that resulted in "subsequent perforation of the skull and the brain and a bullet fragment being located inside the head, just behind the brain." The remaining fragment of the bullet exited through a small wound just behind the entry wound.

Dr. Ross testified with regard to the lack of soot or gunpowder stippling, meaning that the bullet was fired from a distance in excess of three to four feet from the victim. Dr. Ross catalogued various other "fresh . . . , acute injuries . . . [that] may have occurred at or about the time of the gunshot wound[] . . . but could also have occurred several hours earlier." He opined that the trajectory of the bullet was from the top of the victim's head and downward from front to back. "Many different variations" could have resulted in the trajectory - such as, if the victim was leaning forward and the shooter remained upright, or if the victim was standing upright and the shooter was "considerabl[ly] taller than the victim, shooting downward."

Dr. Ross opined that with an injury such as the one the victim sustained, the result could be "quite variable from individual to individual." Some individuals could "essentially die almost immediately," while others could survive for long periods of time ranging from several hours to days with proper medical support. He said that while the injury was "theoretically survivable," the victim would have had permanent brain damage for the remainder of his life.

The State's next witness was Officer Newton Morgan, a crime scene investigator with the Memphis Police Department. During the course of investigating the crime scene at the Bargain Mart, Officer Morgan photographed the area, and another officer sketched the scene. The sketch identified the location where the cellular telephone was recovered, which was on a newspaper stand in front of the store. The State introduced the photographs and sketches into evidence through Officer Morgan.

Lieutenant Anthony Mullins with the Memphis Police Department was the State's next witness. At the time of the offenses, he was assigned to the homicide unit of the department and was appointed as the case coordinator for the September 13 robbery and homicide. When he arrived at the store, the victim was still at the scene, and there was evidence that resuscitative efforts had been attempted. Lieutenant Mullins stated that Officer Chester Striplin obtained the video footage from the Bargain Mart and transferred it to him along with several "still" photographs that he generated from the video. Based on the evidence, Lieutenant Mullins discerned that there were potentially two suspects in the case. He also learned from a witness that prior to the robbery, there was a subject in the store who had dreadlocks. A still photograph depicted a customer with dreadlocks who was wearing a white t-shirt, and a photograph of the suspect showed an individual with dreadlocks who

was wearing a white t-shirt tied around his face and head. Lieutenant Mullins also noted that through the video, one could see light emitting from an open doorway where a second suspect was holding the door open for the shooter.

Lieutenant Mullins described how he discovered and seized into evidence a cellular telephone at the scene that he eventually connected to appellant. Based on the information he received from the cellular provider, Lieutenant Mullins requested that the criminal apprehension team locate appellant, but the team was not immediately successful. However, Lieutenant Mullins ascertained from appellant's mother that "he had been hanging around with" an individual named "Carl" who drove a silver or gray Pontiac. Witnesses from the scene indicated that following the robbery/homicide, the suspects ran to an apartment complex across the street and fled the area in a vehicle matching that description. Lieutenant Mullins asked a sergeant to attempt to locate the vehicle within the apartment complex. He identified three vehicles that matched the description and noted their license plate numbers. The sergeant also observed a spent bullet cartridge in the parking lot of the complex and collected it as possible evidence.

Lieutenant Mullins testified that ultimately, his supervisor received an anonymous tip that appellant would be at a nightclub on the night of October 7 or 8 to collect money for work he had performed. The criminal apprehension team detained appellant that night and arrested him. Appellant was seated in the passenger seat of a silver Pontiac Grand Prix driven by Carl Glenn when the vehicle was stopped. The license plate matched one of the plates that was noted in the parking lot of the apartment complex. Lieutenant Mullins secured a search warrant for the automobile, and during the subsequent search, officers located in the trunk of the vehicle a black t-shirt with white graphics on the front, which appeared to be the item used to obscure the face of one of the robbery suspects. After removing the shirt, they observed a fully-loaded .38 revolver.

Lieutenant Mullins described the procedure he followed in interviewing appellant. After advising appellant of his rights and obtaining a rights waiver, Lieutenant Mullins began the interview at 3:05 p.m. on October 8, 2011. Although appellant initially denied any involvement in the robbery/homicide, he ultimately admitted that he was present at the scene and that he fired the weapon during the robbery.

The State called Special Agent Donna Nelson with the Tennessee Bureau of Investigation ("TBI") as its next witness, and the trial court accepted her as an expert in the field of DNA analysis and serology. Agent Nelson collected DNA from the trigger of the .38 pistol and concluded that the major contributor of the DNA was appellant.

The State's next witness was TBI Special Agent Cervinia Braswell, whom the trial court accepted as an expert in the field of firearms identification. She compared the bullet fragment that was recovered during the autopsy and the shell casing that was found with the .38 revolver. Agent Braswell stated that although the bullet fragment had been badly damaged, she compared the segment that was still intact and determined that it shared the "same width, lands and grooves, [and] direction of twist" as the bullets she test-fired from the revolver. However, she could not conclusively match the fragment with the revolver. The cartridge had no identifiable markings because the primer had been "blown," which was likely due to an "off-center strike of the firing pin."

The State rested its case-in-chief, and appellant rested without presenting any evidence. The jury found appellant guilty of felony murder committed during the perpetration of a robbery, and the trial court sentenced him to life in prison. Following an unsuccessful motion for a new trial, this appeal follows.

## II. Analysis

Appellant raises two issues for our review: (1) whether the trial court erred in denying his motion to suppress his statement to law enforcement officers, and (2) whether the evidence was sufficient to support his conviction.

## A. Motion to Suppress

While appellant was in custody pursuant to a lawful[1] warrant for the September 3 robbery, he gave a statement to law enforcement officers admitting his involvement in the September 13 robbery of the Bargain Mart and the murder of the victim. Appellant filed a motion to suppress the statement, and the trial court held an evidentiary hearing, after which it denied the motion. Appellant argues that the trial court erred because appellant was arrested for the September 13 robbery/homicide without probable cause, was subjected to an unlawful detention pursuant to the "forty-eight-hour hold" policy of the department, and was not advised of his rights until after he gave the statement. The State maintains that the trial court properly denied the motion to suppress.

In reviewing the trial court's decision on a motion to suppress, we review the trial court's legal conclusions de novo. *State v. Northern*, 262 S.W.3d 741, 747 (Tenn. 2008). In doing so, we give deference to the trial judge's findings of fact unless the evidence preponderates otherwise. *Id.*; *see State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). "'[C]redibility of the witnesses, the weight and

---

[1] Appellant does not dispute that the warrant for the September 3 robbery was lawful.

value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d at 23). In reviewing the findings of fact, evidence presented at trial may "'be considered by an appellate court in deciding the propriety of the trial court's ruling on the motion to suppress.'" *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (quoting *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). The prevailing party on the motion to suppress is afforded the "'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *Northern*, 262 S.W.3d at 748 (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)); *see State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *Odom*, 928 S.W.2d at 23.

### 1. Probable Cause/Forty-Eight-Hour Hold

Because these issues are so closely related, we will address them as one. The law requires that when a person is arrested without a warrant, he or she must be brought "before a magistrate to 'seek a prompt judicial determination of probable cause.'" *State v. Bishop*, 431 S.W.3d 22, 42 (Tenn. 2014) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975) (holding that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite to detention")); *see also State v. Huddleston*, 924 S.W.2d 666, 672 n.2 (Tenn. 1996). Tennessee Rule of Criminal Procedure 5(a)(1) provides that "[a]ny person arrested — except upon a capias pursuant to an indictment or presentment — shall be taken without unnecessary delay before the nearest appropriate magistrate." The Tennessee Supreme Court has recently stated that "a delay of less than forty-eight hours is presumptively reasonable" and that when the delay exceeds forty-eight hours, the State must show that "'a bona fide emergency or other extraordinary circumstance' caused the delay." *Bishop*, 431 S.W.3d at 42 (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991)). Nonetheless, even a delay of less than forty-eight hours may be unreasonable "if the delay is 'for the purpose of gathering additional evidence to justify the arrest' or if the delay is 'motivated by ill will against the arrested individual, or delay for delay's sake.'" *Id*. (quoting *McLaughlin*, 500 U.S. at 56).

The remedy for failing to bring an arrestee before a magistrate without unnecessary delay is exclusion of "any evidence obtained by virtue of a suspect's unlawful detention," unless an exception to the exclusionary rule applies. *Bishop*, 431 S.W.3d at 42 (citing *Huddleston*, 924 S.W.2d at 673-75). However, "when a suspect is arrested based on probable cause, the ensuing detention is typically not illegal until it 'ripens' into a *Gerstein* violation." *Id*. (citing *Huddleston*, 924 S.W.2d at 675). "Obviously, if [an arrestee's] statement was given prior to the time the detention ripened into a constitutional violation, it is not the product of the illegality and should not be suppressed." *Huddleston*, 924 S.W.2d at 675.

Appellant was arrested in the early morning hours of October 8 on a valid warrant for the September 3 robbery of the Bargain Mart. He does not contest the validity of that warrant. Lieutenant Mullins placed a forty-eight-hour hold on appellant so that he could interview appellant with regard to the September 13 offenses. During the "hold" period, appellant admitted his involvement in the offenses. However, in this case, the forty-eight-hour hold was of no consequence. Because appellant was already in lawful custody for another offense, there was no need to further detain him by obtaining a forty-eight-hour hold. Moreover, no evidence was presented that appellant was deprived of his opportunity to be released from custody on bond for the charged offense. Thus, *Gerstein* and *Bishop* do not operate to grant appellant relief in the form of suppression of his custodial statement. This issue is without merit.

## 2. Advice of Rights

At the hearing on the motion to suppress, Lieutenant Mullins testified that they interviewed appellant beginning around 3:00 p.m. on October 8. He first noted appellant's biographical information and asked appellant if he needed food, a drink, or a restroom break. He confirmed that appellant was not under the influence of an intoxicant and ascertained appellant's educational level, which was the eleventh grade in high school. Lieutenant Mullins read appellant his rights, and appellant stated that he understood his rights and agreed to give a statement. The State introduced the form signed by appellant at 3:05 p.m., indicating that appellant had been advised of his rights and that he understood his rights. During the interview, appellant admitted his involvement in the September 13 robbery and homicide. Lieutenant Mullins testified that thereafter, he directed appellant to an area where his formal statement would be memorialized by a transcriptionist. Lieutenant Mullins said that before beginning the formal interview, he again advised appellant of his rights. To the contrary, at the suppression hearing, appellant testified that he was not apprised of his rights until after he had given his statement and that if he had been so advised, he would have requested an attorney.

In ruling on the motion to suppress on this basis, the trial court concluded that appellant understood his rights, was able to read, and was not subjected to any coercion, force, psychological pressure, or induced by any promises. The court further held that appellant was advised of his rights prior to his giving a statement and that nothing in the record supported the contention that he made an "unequivocal request for an attorney." The trial court stated, "The court resolves the issue of credibility against [appellant] . . . [and] does accredit the testimony of Lt. Mullins." "'[C]redibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact.'" *Northern*, 262 S.W.3d at 747-48 (quoting *Odom*, 928 S.W.2d

at 23). The record supports the trial court's conclusion in this regard. Appellant is not entitled to relief on this claim of error.

## B. Sufficiency of the Evidence

Appellant argues that the convicting evidence was insufficient because none of it "points the finger of guilt" toward him. The State contends that the evidence was sufficient to sustain the conviction of felony murder during the perpetration of robbery.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

As charged in this case, first degree murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery" Tenn. Code Ann. § 39-13-202(a)(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401.

The evidence against appellant is overwhelming. Notably, appellant confessed to being present at the scene of the crime on September 13 and firing the bullet that ultimately killed the victim. The State presented a videotape captured during the commission of the offense and still photographs obtained therefrom that depicted an individual matching appellant's general description. In addition, appellant's cellular telephone was found outside the Bargain Mart immediately following the robbery/homicide. Witnesses also identified the vehicle in which the perpetrators fled the area. Officers located three similar vehicles in a nearby apartment complex and noted the license plate numbers of each. When appellant was arrested, he was riding in a vehicle matching the description and corresponding with one of the license plates. In the trunk of that vehicle, officers located the .38 caliber revolver that was used in the felony murder. Appellant's DNA was found on the trigger of the weapon. Although the bullet fragment recovered from the victim could not be conclusively linked to the .38 revolver because of its condition, Agent Braswell compared the segment that was still intact and determined that it shared the "same width, lands and grooves, [and] direction of twist" as the bullets she test-fired from the revolver. Finally, Mr. Williams with Turner Dairy testified that he heard one of the perpetrators demanding money from the victim, which supports the element of "perpetration of robbery." Viewing the evidence in the light most favorable to the State, the evidence was sufficient to sustain appellant's conviction. He is not entitled to relief.

## CONCLUSION

Based on the record as a whole, the briefs of the parties, and the applicable legal authority, we affirm the judgment of the trial court.

_____
ROGER A. PAGE, JUDGE

-13-