IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 26, 2025

**STATE OF TENNESSEE v. LARRY E. McKEE, JR.**

**Appeal from the Bradley County Criminal Court**
**No. 22-CR-577     Andrew Freiberg, Judge**

**No. E2024-00990-CCA-R3-CD**



FILED

APR 10 2025

Clerk of the Appellate Courts
Rec'd by

Defendant, Larry E. McKee, appeals his Bradley County conviction for theft of property valued at more than $1,000, but less than $2,500. He contends on appeal that the trial court abused its discretion and committed reversible error by (1) prohibiting Defendant's trial counsel from cross-examining two witnesses as to the manner in which the landlord of the burglarized property received rent payments from the tenants, (2) refusing to allow trial counsel to explain the relevancy of said line of questioning, and (3) threatening to hold the trial counsel in contempt for continuing to ask the witnesses about such payment methods after the trial court ruled them irrelevant. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which MATTHEW J. WILSON, J. and W. MARK WARD, Sp. J., joined.

Todd W. Gee (on appeal), Cleveland, Tennessee; and Abby Carrol (at trial), Assistant Public Defender, Cleveland, Tennessee, for the appellant, Larry E. McKee, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Ryan W. Davis, Assistant Attorney General; Shari Lynn Tayloe, District Attorney General; and Dallas Scott III, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

***Factual and Procedural History***

The Bradley County Grand Jury indicted Defendant for burglary and theft of property valued at more than $2,500. The case proceeded to trial on August 16, 2023.

Corporal Eddie Blackwell, a detective with the Bradley County Sheriff's Department, testified that on October 12, 2020, he responded to a call reporting the burglary of a residence at 3370 Buchanan Road in Bradley County ("the property"). Upon arriving, Corporal Blackwell spoke with Christopher Bowling and Lance Sears, residents of the property, who advised him that certain personal property was missing from the residence. These items included a basketball goal and a lawn mower.

After leaving the premises, Corporal Blackwell testified he came across a truck parked on the side of the road less than a mile away from the property. The truck was hauling a basketball goal and a lawnmower. Observing that the items matched the description of the stolen items, Corporal Blackwell testified that he stopped and spoke with Defendant, who was standing next to the truck.

Corporal Blackwell testified that he questioned Defendant about the basketball goal and lawnmower. Defendant informed him that he retrieved the items from "down the road." After reading Defendant his *Miranda* rights, Defendant told Corporal Blackwell that he had been given permission by Tim Shaw to retrieve the items. Corporal Blackwell then called Mr. Bowling and Mr. Sears to inquire into the identity of Mr. Shaw, and they informed him that Mr. Shaw was the owner of the property.

Mr. Bowling and Mr. Sears arrived at the scene and confirmed that the items on the trailer were their items which had been located at the property. Corporal Blackwell then turned the items over to Mr. Bowling and Mr. Sears. He placed Defendant in custody and transported him to the Bradley County Sherriff's Office.

On cross-examination, Corporal Blackwell testified that Defendant was cooperative with and responsive to his questioning. He further stated that either Mr. Bowling or Mr. Sears gave him Mr. Shaw's phone number, and he twice attempted unsuccessfully to contact Mr. Shaw.

Christopher Bowling testified that he and his family were moving out of the property on the day of the burglary. Upon returning to the premises after leaving to get food, Mr. Bowling noticed a number of items missing, including a lawnmower, a grill, a basketball goal, and three lanterns. He stated that the total value of these items was $1,630.

On cross-examination, Mr. Bowling testified that Mr. Spears was the only resident listed on the lease. Mr. Bowling also testified that he did not know Defendant socially but had seen him patronize his place of employment.

- 2 -

Lance Sears testified that he began working for Mr. Shaw in June 2019 and was renting the property from him as a condition of that employment arrangement. He testified that he was in the process of moving out of the property on the date of the burglary pursuant to an arrangement he had with Mr. Shaw. Mr. Sears was the sole resident on the lease.

Mr. Sears stated that on October 12, 2020, he and his family had left the property in the middle of their moving out in order to get food. Upon returning, he noticed that a toolbox he kept in the back of his truck had been pulled out into the yard alongside the house and emptied. Mr. Sears then called law enforcement.

Mr. Sears noticed tools were missing from his toolbox, including a SkilSaw, a Sawzall, drills, sheetrock tools, electrical tools for electrical work, and plumbing tools. He valued the items at $1,000. He also testified that the following items were also missing: a push mower, a rototiller, three toolboxes, a shop vacuum, a wrought iron bench, and a partially full bucket of nails. He valued these items at a total of $425.

Mr. Sears stated that he was moving from the property because he was terminating his employment with Mr. Shaw due to "moral differences" between them. He explained, "[I]t just got to where I couldn't morally do it anymore." According to Mr. Sears, he and Mr. Shaw had come to an agreement wherein Mr. Sears was given a certain amount of time to move from the property.

Trial Counsel asked Mr. Sears whether he was renting the property from Mr. Shaw in his personal capacity or First Enterprises, the sole proprietorship of Mr. Shaw. Mr. Sears said that he "looked at them as the same, so [he was] not real sure how they had the documentation set up." When Trial Counsel inquired into whether Mr. Sears ever paid rent by check, he replied that payment was made in "all different types of ways. It was checks. It was cash at one point. You know there were times when he would just take it out of my paycheck [without prior consent]."

Trial Counsel proceeded by asking Mr. Sears whether he wrote the checks to Mr. Shaw individually or to First Enterprises, to which the State objected on grounds of relevancy. The following interaction then occurred:

THE COURT: How is payment method relevant?

[TRIAL COUNSEL]: Your Honor, again this is going to the property. In this lease I don't know if the landlord is Tim Shaw, First Enterprises, and it is going to be relevant for the possession of this property –

- 3 -

THE COURT: I overrule. And I will just say if it can't be done succinctly, it's a long explanation for relevance, it's not; so I'm going to overrule it. I'm deeming it not relevant. Payment method is irrelevant.

Trial Counsel continued without objection and asked Mr. Sears whether he knew if Mr. Shaw or First Enterprises was his landlord. Mr. Sears answered, "I look at them as the same, so, no. . . ." Trial Counsel followed up by asking, "But First Enterprises was taking money out of your paycheck for your rent?" The State objected, and the trial judge sustained the objection and stated, "I have deemed that irrelevant." Trial Counsel continued without objection, asking Mr. Sears whether he was behind on rent payments. Mr. Sears confirmed that he was behind, but he was unsure of the amount.

Trial Counsel also questioned Mr. Sears as to the reason for his leaving Mr. Shaw's employment. Mr. Sears testified that he had "built and remodeled houses for 25 years" and "believed in doing things the right way." According to him, he was "asked to band-aid a lot" and "just didn't like the way [Mr. Shaw] treated tenants in the aspect of repairs. . . ."

Mr. Sears also testified as to the circumstances of his and Mr. Shaw's landlord-tenant relationship. He explained, "[Mr. Shaw] kind of talked me into living [at the property] . . . when I went to work for him." He testified that the property was in "massive disrepair," but that Mr. Shaw had reassured him that he would be provided with the materials to make necessary repairs. Despite these assurances, Mr. Sears testified that many of the issues were never addressed. "[T]he entire time we were there we never had a kitchen. . . . The bathroom floor was falling in. The only way anything got fixed was if I fixed it."

Mr. Sears confirmed that he had been sued by Mr. Shaw in regard to the unpaid rental payments and that Mr. Shaw had obtained a $12,000 judgment against Mr. Sears.

Trial Counsel once again questioned Mr. Sears regarding the method of rental payment to Mr. Shaw in the following interaction:

Q      [By Trial Counsel:] [First Enterprise] was taking money out of your paycheck?

THE COURT: Counsel.

[TRIAL COUNSEL]: Your Honor, it is relevant because he is sued –

THE COURT: I'm sustaining the objection.

- 4 -

[TRIAL COUNSEL]: That's fine.

Q    [(By Trial Counsel)] Who were you sued by?  First —
     THE COURT: That's the third time, too, Counsel.
     [TRIAL COUNSEL]: Yes, Your Honor.

Trial Counsel made no objection to the trial court's ruling.

On redirect, Mr. Sears stated that he was still in possession of the property on the day of the burglary and was free to remain on the premises until he had completely moved out. Moreover, he confirmed that he was given a timeframe in which to move out and that he was still within that timeframe at the time of the burglary.

On recross-examination, Mr. Sears testified that he had never met or heard of Defendant prior to the night of the burglary. He also testified that there was no signage on the property indicating that the house was for rent by Mr. Shaw or First Enterprises.

Tim Shaw testified that he owned a real estate brokerage and was a practicing attorney. He explained that First Enterprises was a real estate and construction company that he owned as a sole proprietor. Mr. Shaw also testified that the property was owned by him in his individual capacity along with his mother. He confirmed that, at the time of the burglary, Mr. Sears was occupying the property but was in the process of moving out. Mr. Shaw testified that Mr. Sears's health problems had caused him to fall behind on the rental payments, and the two came to an agreement for him to be moved out by October 25, 2020. He confirmed that he repossessed the property on October 30, 2020. Furthermore, Mr. Shaw said that he did not know Defendant and had never given him permission to enter the property.

On cross-examination, Trial Counsel questioned Mr. Shaw as to the reason that First Enterprises was listed in the lease agreement between him and Mr. Sears if Mr. Sears had rented the property from him and his mother in their individual capacities. Mr. Shaw explained that First Enterprise was the location of his personal office and the place where tenants paid their rent. He testified, "I don't want them trying to find me at my home. I have a business for that purpose." He stated that he made clear to his tenants that he and First Enterprise were two separate entities.

Trial Counsel then attempted to ask Mr. Shaw whether it would make more sense for his tenants to pay rent to First Enterprises rather than to him individually, and Mr. Shaw stated, "They need to pay it to Tim Shaw at the office of First Enterprise." Trial Counsel repeated the question, and the State objected. The trial court called a jury out hearing, and the following interaction occurred:

- 5 -

THE COURT: . . . Counsel, that's now the fourth time you've asked questions about where Lance Sears or how he addressed payments or checks. I do not find it relevant how Lance Sears addressed a rent check. I understand that you think it's relevant. It is preserved for the record, but if you ask that question again, I am going to be compelled to issue a show cause for why you shouldn't be held in contempt. It is four questions about how Lance Sears addresses his rent payments. I do not deem it relevant, and I'm instructing you not to ask that question again during this trial.

[TRIAL COUNSEL]: Yes, Your Honor.

Trial Counsel once again made no objection.

Mr. Shaw reaffirmed that he did not know Defendant in response to Trial Counsel asking whether Mr. Shaw had rented a separate property to Defendant in 2010. He explained, "I've had a lot of tenants that's moved in and out. . . . And I don't get to know my tenants." Trial Counsel inquired into whether Mr. Shaw's office had conducted a search of their records for Defendant when Mr. Shaw was notified of the pending criminal case, and Mr. Shaw testified that it did but to no avail. Trial Counsel then asked Mr. Shaw whether the lease agreement between him and Mr. Sears allowed First Enterprise to remove any personal property of the tenants left at the property after abandonment or vacation thereof, and Mr. Shaw testified that it did.

At the conclusion of the State's proof, Defendant moved for judgment of acquittal on all counts. The trial court denied the motion, finding that a reasonable jury could find Defendant guilty on all counts.

Defendant did not testify or present any proof.

Based on this proof, the jury returned a verdict of not guilty on the count of burglary and guilty on the lesser-included offense of theft over $1,000, but less than $2,500. The trial court sentenced Defendant as a Range II offender to three years in the Tennessee Department of Correction.

On November 1, 2023, Defendant filed a motion for new trial, wherein he claimed that there was insufficient evidence to support his conviction, that the presentation of his defense was unduly prejudiced by the trial court's sustaining of multiple objections during

his cross-examinations of Mr. Sears and Mr. Shaw, and that the evidence was insufficient to support the Defendant's sentence.[1]

On May 28, 2024, Defendant, through new counsel, filed an amended motion for new trial. On June 7, 2024, the trial court heard arguments and denied the motion.

Defendant filed a timely appeal.

## *Analysis*

### *Relevancy*

On appeal, Defendant claims that the trial court committed reversible error by deeming questions regarding the method of rental payments irrelevant. Specifically, he argues that such questions were relevant to the theft charge because it tended to undermine Mr. Shaw's credibility. The State argues that the trial court properly exercised its discretion in excluding the questions as irrelevant. We agree with the State.

We review a trial court's evidentiary decisions under an abuse of discretion standard and will reverse the decision only if "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and admission or exclusion of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

Under Rule 401 of the Tennessee Rules of Evidence, evidence is deemed relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Moreover, under Rule 608, prior bad acts of a witness may only be inquired into on cross-examination where the underlying conduct "concern[s] the witness's character for truthfulness or untruthfulness."

The trial court did not abuse its discretion in ruling that the method of rental payments was not relevant to Defendant's case because such decision was not "against logic or reasoning" or based on "an incorrect legal standard." *See Gilliland*, 22 S.W.3d 266 at 270. The trial court in this case based its conclusion on the belief that the method of rental payments was not relevant to Mr. Shaw's character for truthfulness. This ruling

---

[1] On November 15, 2023, Trial Counsel moved to withdraw because Defendant had filed a complaint against her with the Tennessee Board of Professional Responsibility. The trial court granted the motion on February 12, 2024, and appointed Appellate Counsel to represent him in further proceedings.

is in line with the requirements of Rules 401 and 608 of the Tennessee Rules of Evidence. Further, the trial court could reasonably conclude that Mr. Shaw's failure to properly separate his personal identity from his sole proprietorship in his relationship with Mr. Sears did not sufficiently implicate his veracity to render such fact relevant character evidence. *See* Tenn. R. Evid. 401, 608.

Moreover, even assuming marginal relevancy of rental payments, the exclusion of such testimony did not "cause[] an injustice" to Defendant. *See Gilliland*, 22 S.W.3d 266 at 270. Defendant was able to elicit testimony from Mr. Sears regarding his objections to Mr. Shaw's business practices. Mr. Sears also testified that Mr. Shaw was removing rental payments from his paycheck without prior consent. Defendant was allowed to question Mr. Shaw regarding whether he had previously rented property to Defendant, despite Mr. Shaw claiming not to know him. This testimony was sufficient to support Defendant's theory of the case, and we do not see how an additional line of questioning regarding the method of rental payments would have affected the jury's verdict.

The trial court did not abuse its discretion in holding the method of rental payments irrelevant. Defendant is not entitled to relief.

### Right to Confrontation

On appeal, Defendant asserts that his rights under the Confrontation Clause of the United States Constitution and Article 1, section 9 of the Tennessee Constitution were violated by the trial court's ruling that the method of payment of rental payments was irrelevant and its refusal to allow Trial Counsel to explain the relevancy of the payment method. He also claims that the same were violated by the trial court's threat of contempt. The State argues that Defendant has waived his Confrontation Clause and Article 1 claims by not raising the issue at trial and in any event the trial court properly deemed such testimony irrelevant and that the decision to threaten contempt was proper. Defendant argues that his Confrontation Clause claims were not waived because they were sufficiently raised at trial and in its motion for new trial. We agree with the State.

Ordinarily, before a party can challenge an evidentiary ruling by the trial court on appeal, the party must have preserved the issue in the trial court. "To preserve an issue, the party should first assert a timely objection identifying a specific ground." *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *3 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*. A party's "specific ground" for an objection is important because a party generally may not "assert a new or different theory to support the objection" in the appellate court. *State v. Howard*, No. M2020-01053-CCA-R3-CD, 2021 WL 5918320, at *6 (Tenn. Crim. App. Dec. 15, 2021), *no perm. app. filed*. Raising

- 8 -

an issue for the first time in a motion for new trial does not avoid a determination that such issue has been waived. *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020).

Defendant relies on *State v. Bowers*, No. M2022-00949-CCA-R3-CD, 2023 WL 6211909, (Tenn. Crim. App. Sept. 25, 2023), *no perm. app. filed* (not for citation), to assert that a defendant does not have to explicitly state that his objection was pursuant to the Confrontation Clause in order to avoid waiver of plenary review. In *Bowers*, the trial court had allowed a prosecution witness to testify remotely via an online audio-visual application called Zoom. *Id.* at *1. Defense counsel objected at trial, stating, "I would object to Zoom. . . . I think I can do a more effective cross-examination personally." *Id.* at *3. The defendant did not explicitly refer to his Confrontation rights until he filed a motion for new trial. *Id.* at *4. A panel of this Court found that the defendant had not waived his Confrontation claims because "the context of the proceedings makes clear that Defendant was objecting to [the witness's] remote testimony." *Id.* at *5.

However, *Bowers* is sufficiently distinguishable. Trial Counsel in this case did not merely fail to cite the Confrontation Clause or Article 1. Trial Counsel completely failed to make any reference to any right granted under such provisions, unlike the defense counsel in *Bowers* who explicitly referred to his client's right to cross-examination. *Id.* at *5. Instead, the only arguments made by Trial Counsel in this case in opposition to the trial court's challenged ruling was on issues of relevancy. It is not "clear from [this] context" that Defendant was raising a challenge under the Confrontation Clause or Article 1.

Lastly, while Defendant did argue in his motion and hearing for a new trial that the trial court's conduct unconstitutionally limited his rights to cross-examination, this fact does not avoid waiver of his claims where he failed to raise such issues contemporaneously at trial. *See Vance*, 596 S.W.3d at 254.

Therefore, Defendant's claims under the Confrontation Clause of the United States Constitution and Article 1, section 9 of the Tennessee Constitution are waived.

*Plain Error Review*

Defendant asserts, in the alternative, that he is entitled to plain error relief on his claims under the Confrontation Clause of the United States Constitution and Article 1, section 9 of the Tennessee Constitution. The State claims that Defendant is not entitled to such relief. We agree with the State.

In criminal cases, the doctrine of plain error permits appellate courts to consider issues that were not raised in the trial court. Tennessee Rule of Appellate Procedure 36(b)

states in part that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." It is well-settled that the discretionary authority to invoke the plain error doctrine should be "sparingly exercised," *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), because "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbitrators of legal questions presented and argued by the parties before them." *State v. Northern*, 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting) (quoting *Carducci v. Regan*, 714 F.2d 171, 177, 230 U.S. App. D.C. 80 (D.C. Cir. 1983)).

To determine whether a trial error rises to the level of justifying "plain error" review, we look to the following five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014). Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642).

Assuming that the trial court's challenged rulings constituted plain error, Defendant has failed to demonstrate that the trial court's exclusion of testimony regarding the method of rental payments or its decision to threaten Trial Counsel with contempt "probably changed the outcome of the trial." *See Bishop*, 431 S.W.3d at 44. Trial Counsel testified that the proposed relevancy of such testimony was to establish the apparent authority of Mr. Shaw to command Defendant to enter the property and to impeach the general credibility of Mr. Shaw. She further testified that, absent the threat of contempt, she "would have continued to pursue with Mr. Shaw his business practices, the ownership of the property, the way in which he does own those properties, and his relationship with [Defendant]."

However, Defendant was allowed by the trial court to put forward other evidence substantially supporting Mr. Shaw's apparent authority to authorize Defendant's actions

- 10 -

and his alleged untrustworthiness. Defendant was allowed to cross-examine Mr. Sears as to his moral objections to Mr. Shaw's business practices. He was permitted to elicit testimony from both Mr. Shaw and Mr. Sears establishing that the former had obtained a judgment against the latter for unpaid rent. He was able to have Mr. Sears admit that First Enterprise was taking rent payments from his paychecks without prior authorization. He questioned Mr. Shaw as to whether he knew that he had previously rented property to Defendant. Finally, he had Mr. Shaw admit that the lease agreement allowed First Enterprise to remove personal property left on the property after vacation or abandonment thereof. Despite this evidence, the jury returned a verdict finding Defendant guilty of theft over $1,000, less than $2,500. From this verdict, we presume that the jury found credible Mr. Shaw's testimony that he did not know Defendant, and we find there is no reason to believe the Trial Counsel's proposed lines of additional questioning would have changed that verdict.

Therefore, consideration of the alleged errors is not necessary for substantial justice, and Defendant is not entitled to the plain error relief.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.


s/Timothy L. Easter
TIMOTHY L. EASTER, JUDGE

- 11 -